JS-6

1
2
3
4
5
6                    UNITED STATES DISTRICT COURT

7                    CENTRAL DISTRICT OF CALIFORNIA

8

9   TANYA VASSERMAN, on behalf of          )  CASE NO. CV 14-06245 MMM (PLAx)
    herself and all others similarly situated )
10  and the general public,                  )
                                             )
11              Plaintiff,                   )  ORDER GRANTING PLAINTIFF'S
                                             )  MOTION TO REMAND AND DENYING
12         vs.                               )  DEFENDANT'S MOTION TO DISMISS
                                             )  AS MOOT
13  HENRY MAYO NEWHALL                       )
    MEMORIAL HOSPITAL, and DOES 1            )
14  to 100, inclusive,                       )
                                             )
15              Defendants.                  )
                                             )
16  ─────────────────────────────

17        On June 18, 2014, Tanya Vasserman filed this putative class action in Los Angeles

18  Superior Court against Henry Mayo Newhall Memorial Hospital ("Newhall Memorial") and

19  various fictitious defendants, alleging violations of state wage and hour laws.[1]  Newhall Memorial

20  removed the action on August 8, 2014, invoking the court's federal question jurisdiction under

21  28 U.S.C. § 1331, and diversity jurisdiction under the Class Action Fairness Act of 2005

22  ("CAFA"), 28 U.S.C. § 1332(d).[2]  Newhall Memorial asserts the court has federal question

23  jurisdiction because Vasserman's state law claims are preempted by the Section 301 of the Labor

24  Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185.[3]  It asserts additionally that if

25  ─────────────────────────────

26        [1]Notice of Removal ("Removal"), Docket No. 1 (Aug. 8, 2014), Exh. 1 ("Complaint").

27        [2]Removal at 2-7.

28        [3]*Id*. at 3.

1    no federal question is presented, there is minimal diversity and the amount in controversy exceeds

2    $5 million.

3         On September 8, 2014, Vasserman filed a motion to remand the action to Los Angeles

4    Superior Court for lack of subject matter jurisdiction.[4]  The same day, Newhall Memorial filed

5    a motion to dismiss Vasserman's complaint for failure to grieve and arbitrate her claims.[5]  On

6    October 7, 2014, the court entered an order extending the time for the parties to file opposition

7    to the motions to November 3, 2014.[6]  On November 3, 2014, Newhall Memorial opposed

8    Vasserman's motion to remand,[7] and Vasserman opposed Newhall Memorial's motion to dismiss.[8]

9         Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the court

10    finds this matter appropriate for decision without oral argument.  The hearing calendared for

11    December 8, 2014, is therefore vacated, and the matter taken off calendar.

12

13

14

15

16

17

18

19

20    [4]Notice of Motion and Motion to Remand Case to Los Angeles Superior Court ("Motion to Remand"), Docket No. 13 (Sept. 8, 2014).

21

22    [5]Notice of Motion and Motion to Dismiss Case ("Motion to Dismiss"), Docket No. 14 (Sept. 8, 2014).

23

24    [6]Order Regarding Briefing Schedules on Defendant's Motion to Dismiss or Strike and Plaintiff's Motion to Remand, Docket No. 18 (Oct. 7, 2014).

25

26    [7]Memorandum in Opposition to Motion to Remand Case to Los Angeles Superior Court ("MTR Opp."), Docket No. 19 (Nov. 3, 2014).

27    [8]Plaintiff's Opposition to Defendant's Motion to Dismiss Plaintiff's Complaint, or

28    Alternatively, to Strike Plaintiff's Prayer for Declaratory Relief ("MTD Opp."), Docket No. 20 (Nov. 3, 2014).

# I.  FACTUAL BACKGROUND

**A.     Facts Alleged in the Complaint**

### 1.     Factual Allegations Concerning All Plaintiffs

Vasserman is a clinical registered nurse who, prior to this litigation, worked at Newhall Memorial as an hourly, non-exempt employee.[9]  She and the members of the putative class she seeks to represent are current and former employees of Newhall Memorial who were allegedly paid improper wages under Newhall Memorial's straight time pay plan and/or rounding pay plan, and were denied compliant meal periods as required by California law.[10]

### a.     Newhall Memorial's Alleged Failure to Pay All Wages Earned and Appropriate Overtime Compensation

Vasserman alleges, on information and belief, that pursuant to an established business practice and policy, Newhall Memorial schedules its non-exempt hourly employees to work in excess of eight hours a day; at times, it purportedly schedules employees to work shifts in excess of ten and twelve hours.[11]  Additionally, Newhall Memorial's patient care employees, who include clinical registered nurses like Vasserman, are allegedly scheduled for shifts that exceed eight hours a day and eighty hours per pay period but do not receive straight time and overtime pay as required by law.[12]

Vasserman asserts that Newhall Memorial's policy is to pay straight time, rather than overtime, for all hours worked in excess of eight hours a day.[13]  Because overtime hours are paid at the employee's base rate of pay, rather than at time-and-a-half, Newhall Memorial purportedly pays hourly, non-exempt employees less overtime compensation than they are guaranteed under

---

[9]Complaint, ¶ 27.

[10]*Id.*, ¶ 17.

[11]*Id.*, ¶ 27.

[12]*Id.*, ¶¶ 27, 46.

[13]*Id.*, ¶ 28.

3

1   the California Labor Code.[14]   Vasserman alleges that Newhall Memorial designed its overtime

2   compensation policy intentionally to deny its employees a premium rate for overtime hours and

3   to avoid the payment of overtime altogether despite the fact that it has not received a statutory

4   exemption under the California Labor Code.[15]

5                      **b.      Newhall Memorial's Allegedly Improper Meal Policies**

6              Vasserman also alleges that Newhall Memorial's meal period policies violate the California

7   Labor Code and Wage Order 5-2001 of the California Industrial Welfare Commission ("IWC").[16]

8   Specifically, she asserts that Newhall Memorial violates state law by failing to provide her and

9   other hourly, non-exempt employees compliant meal periods; she asserts that it does so despite

10  having not received a valid waiver of the meal period requirement or having qualified for any

11  statutory exemption.[17]   Vasserman alleges that she and other class members consistently worked

12  in excess of five hours without meal breaks because Newhall Memorial regularly discouraged

13  them from taking meal breaks and impeded their ability to take the breaks.[18]   Vasserman was also

14  allegedly required to answer pager messages during meal breaks, when they were provided, which

15  prevented her from taking an uninterrupted break.[19]

16                      **c.      Newhall Memorial's Alleged Failure to Provide Itemized Wage**
17                              **Statements**

18              Vasserman alleges, on information and belief, that in addition to Newhall Memorial's

19  allegedly unlawful overtime and meal period policies, it consistently failed to provide its

20

21  _____

22      [14]*Id.*

23      [15]*Id.*, ¶¶ 28-29.

24      [16]*Id.*, ¶ 30.

25      [17]*Id.*

26      [18]*Id.*, ¶ 71.

27      [19]*Id.*

28

1   employees itemized wage statements in accordance with California Labor Code § 226.[20]
2   Specifically, she asserts that Newhall Memorial provided wage statements that did not accurately
3   reflect the employee's actual regular rate of pay; the total hours worked by the employee during
4   the pay period; the net wages earned; the name and address of the employer; and the applicable
5   hourly rates paid during the pay period together with the number of hours worked at each rate of
6   pay.[21]

7               **d.    Newhall Memorial's Alleged Failure to Pay Proper Wages as a**
8                       **Result of its Rounding Policy**

9           Finally, Vasserman contends that Newhall Memorial employs a rounding policy in
10   calculating employee wages that disproportionately and negatively impacts employees.[22]  She
11   asserts that the actual time worked by employees was usually rounded down so that employees
12   were not paid for all time worked.[23]  Newhall Memorial purportedly implemented this rounding
13   policy with intent to deceive employees and cause them to believe that they were being paid proper
14   compensation for all hours worked.[24]

15              **2.    The Putative Classes**

16          Vasserman seeks to represent five putative classes of current and former Newhall Memorial
17   employees:[25]

18          Class 1:        All hourly, non-exempt employees of Newhall Memorial who worked more
19                          than eight (8) hours in a day or more than forty (40) hours in a week from
20                          four (4) years before the filing of this action through the date of judgment

---

22          [20]*Id.*, ¶ 32.

23          [21]*Id.*, ¶¶ 33, 66.

24          [22]*Id.*, ¶ 34.

25          [23]*Id.*, ¶ 92.

26          [24]*Id.*, ¶ 37.

27          [25]*Id.*, ¶ 18.

1     and were not paid proper premium overtime and double time wages ("Pay

2     Plan Class");

3     Class 2:     All hourly, non-exempt employees who worked for Newhall Memorial at

4                  some point from four (4) years before the filing of this action through the

5                  date of judgment, and who are no longer employed by Newhall Memorial

6                  ("Waiting Time Penalty Class");

7     Class 3:     All hourly, non-exempt employees who worked for Newhall Memorial from

8                  four (4) years before the filing of this action through the date of judgment

9                  who were subjected to Newhall Memorial's meal period policies and

10                 practices ("Meal Break Class");

11    Class 4:     All hourly, non-exempt employees who worked for Newhall Memorial from

12                 one (1) year before the filing of this action through the date of judgment who

13                 were provided a paystub, i.e., wage statement, by Newhall Memorial ("Pay

14                 Stub Class"); and

15    Class 5:     All hourly, non-exempt employees who worked for Newhall Memorial from

16                 four (4) years before the filing of this action through the date of judgment,

17                 who were subject to Newhall Memorial's rounding policy and practice

18                 ("Rounding Class").

19         **3.    Vasserman's Claims**

20         On behalf of these classes, Vasserman pleads claims for (1) violation of California's Unfair

21    Competition Law ("UCL"), California Business and Professions Code § 17200 *et seq.*;[26]

22    (2) failure to provide overtime compensation in violation of California Labor Code §§ 204, 510,

23    1194, 1198;[27] (3) waiting time penalties in violation of California Labor Code § 200 *et seq.*;[28]

24

25    _____

26         [26]*Id.*, ¶¶ 24-44.

27         [27]*Id.*, ¶¶ 45-56.

28         [28]*Id.*, ¶¶ 57-63.

1  (4) failure to provide itemized wage statements in violation of California Labor Code § 226;[29]
2  (5) failure to provide meal breaks in violation of California Labor Code § 226.7;[30] (6) a private
3  attorney general ("PAGA") action under California Labor Code §§ 2698-99 for violations of the
4  Labor Code;[31] and (7) failure to pay all wages due to illegal rounding in violation of California
5  Labor Code §§ 204, 510, 1197, 1198.[32]

6  **B.   The Parties' Requests for Judicial Notice**

7  Vasserman requests that the court take judicial notice of two documents in connection with
8  her motion to remand the action to Los Angeles Superior Court,[33] while Newhall Memorial
9  requests that the court take judicial notice of four documents in deciding its motion to dismiss
10  Vasserman's complaint.[34]  The parties' respective requests are unopposed.

11  A court can consider evidence in deciding a remand motion, including documents that can
12  be judicially noticed.  See, e.g., *Ryti v. State Farm General Ins. Co.*, No. C 12-01709 JW, 2012
13  WL 2339718, *1 n. 4 (N.D. Cal. May 30, 2012) (granting plaintiffs' request for judicial notice
14  and considering documents that were proper subjects of judicial notice in deciding a remand
15  motion); *Vasquez v. Arvato Digital Services, LLC*, No. CV 11-02836 RSWL (AJWx), 2011 WL
16  2560261, *2 (C.D. Cal. June 27, 2011) (considering  documents that were proper subjects of

18  [29]*Id.*, ¶¶ 64-69.

19  [30]*Id.*, ¶¶ 70-73.

20  [31]*Id.*, ¶¶ 74-83.

21  [32]*Id.*, ¶¶ 84-99.

23  [33]Request for Judicial Notice in Support of Plaintiff's Motion to Remand to State Court
("Pl.'s RJN"), Docket No. 13-5 (Sept. 8, 2014); Request for Judicial Notice in Support of Reply
24  in Support of Motion to Remand Case to Los Angeles Superior Court ("Pl.'s Reply RJN"),
Docket No. 21-1 (Nov. 21, 2014).

26  [34]Defendant's Request for Judicial Notice in Support of its Motion to Dismiss Plaintiff's
Complaint, or in the Alternative, to Strike Plaintiff's Prayer for Declaratory Relief ("Def.'s
27  RJN"), Docket No. 14-1 (Sept. 8, 2014); Defendant's Request for Judicial Notice in Support of
its Reply to Plaintiffs' Opposition to Defendant's Motion to Dismiss Complaint ("Def.'s Reply
28  RJN"), Docket No. 22-1 (Nov. 21, 2014).

7

1  judicial notice in deciding a remand motion); *Aniel v. TD Serv. Co.*, No. C 10-05323 WHA, 2011

2  WL 109550, *3 (N.D. Cal. Jan. 13, 2011) (taking judicial notice of court orders and the judgment

3  in a prior case as public records in deciding a motion to remand); *Deutsche Bank Nat. Trust Co.*

4  *v. Sitanggang*, No. 1:09CV01835 AWI DLB, 2010 WL 144439, *1 n. 1 (E.D. Cal. Jan. 11,

5  2010) (taking judicial notice of documents proffered by plaintiff in deciding a motion to remand);

6  *Flower v. Wachovia Mortg. FSB*, No. C 09-343 JF (HRL), 2009 WL 975811, *2-3 (N.D. Cal.

7  Apr. 10, 2009) (court took judicial notice of Office of Thrift Supervision documents regarding the

8  corporate structure of Wells Fargo and Wachovia to determine the citizenship of the defendant

9  corporation for purposes of a remand motion).

10      In deciding a Rule 12(b)(6) motion, however, courts generally look only to the face of the

11  complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d

12  977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542,

13  1555 n. 19 (9th Cir. 1990). Although a court must normally convert a Rule 12(b)(6) motion into

14  a Rule 56 motion for summary judgment if it "considers evidence outside the pleadings . . . [it]

15  may consider certain materials – documents attached to the complaint, documents incorporated

16  by reference in the complaint, or matters of judicial notice – without converting the motion to

17  dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 907-08

18  (9th Cir. 2003). See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (a

19  court may consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6)

20  motions to dismiss, in particular, documents incorporated into the complaint by reference, and

21  matters of which a court may take judicial notice"); *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.

22  1994) (noting that a court may consider a document whose contents are alleged in a complaint,

23  so long as no party disputes its authenticity), overruled on other grounds by *Galbraith v. County*

24  *of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

25      Thus, in deciding Vasserman's motion to remand and Newhall Memorial's motion to

26  dismiss, the court can consider material that can be judicially noticed under Rule 201 of the

27  Federal Rules of Evidence. FED.R.EVID. 201. Under Rule 201, the court can take judicial notice

28  of "[o]fficial acts of legislative, executive, and judicial departments of the United States," and

1    "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate

2    and accurate determination by resort to sources of reasonably undisputable accuracy."

3        The parties request that the court take notice of four court orders: (1) an order by Judge

4    Philip S. Gutierrez remanding *Marincovich v. Aramark Uniform & Career Apparel, Inc.*, No. CV

5    12-10245 PSG (JEMx), filed March 11, 2013;[35] (2) an order Judge Jesus G. Bernal remanding

6    *Bart v. Parkview Community Hospital Medical Center*, No. EDCV 14-1614 JGB (DTBx), filed

7    September 18, 2014;[36] (3) the opinion of the Ninth Circuit Court of Appeals in *Landers v. Quality

8    Communications*, No. 12-15890, dated November 12, 2014;[37] and (4) an order by Judge Beverly

9    Reid O'Connell in *Maiava v. Brinderson Constructors, Inc.*, No. 2:14-CV-05514 BRO (AJWx),

10   filed November 12, 2014.[38]

11       "Under Federal Rule of Evidence 201, the [c]ourt may take judicial notice of matters of

12   public record if the facts are not 'subject to a reasonable dispute.'"  *Olds v. Metlife Home Loans*,

13   No. SACV 12-55 JVS (RNBx), 2012 WL 10420298, *1 n. 1 (C.D. Cal. Mar. 19, 2012) (citing

14   *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001)).  Court orders and filings are

15   proper subjects of judicial notice.  See, e.g., *United States v. Black*, 451 F.3d 550, 551 (9th Cir.

16   2007) (noting that a court "may take notice of proceedings in other courts, both within and without

17   the federal judicial system, if those proceedings have a direct relation to matters at issue"); *Reyn's

18   Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (taking judicial notice

19   of pleadings, memoranda, and other court filings); *Asdar Group v. Pillsbury, Madison & Sutro*,

20   99 F.3d 289, 290 n. 1 (9th Cir. 1996) (court may take judicial notice of pleadings and court orders

21   in related proceedings); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo,

22   Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (a court may take judicial notice "of proceedings in other

23

24   _____

25       [35]Pl.'s RJN, Exh. 1.

26       [36]Pl.'s Reply RJN, Exh. 1.

27       [37]Def.'s Reply RJN, Exh. A.

28       [38]Def.'s Reply RJN, Exh. B.

courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue"); *U.S., ex rel. Modglin v. DJO Global Inc.*, __ F.Supp.2d __, 2014 WL 4783575, *11 (C.D. Cal. Sept. 2, 2014) ("As respects court orders and filings in other FCA cases, these documents, too, are the proper subject of judicial notice" (citations omitted)); *Farahani v. Floria*, No. 12-CV-04637 LHK, 2013 WL 1703384, *1 n. 1 (N.D. Cal. Apr. 19, 2013) ("The remaining documents submitted for judicial notice are all documents filed in previous and concurrent lawsuits, which are similarly suitable for judicial notice under Fed.R.Evid. 201(b)").  Because each of these documents is a proper subject of judicial notice, the court grants the parties' requests, and will consider them in deciding the pending motions.

Newhall Memorial also asks that the court take judicial notice of the operative complaint in this action.[39]  It is well established that a court can take judicial notice of its own files and records under Rule 201 of the Federal Rules of Evidence.  *Molus v. Swan*, No. 05cv452-MMA (WMc), 2009 WL 160937, *2 (S.D. Cal. Jan. 22, 2009) ("Courts also may take judicial notice of their own records," citing *United States v. Author Services*, 804 F.2d 1520, 1523 (9th Cir. 1986)); see also *NovelPoster v. Javitch Canfield Group*, No. 13-CV-05186-WHO, 2014 WL 5594969, *4, n. 7 (N.D. Cal. Nov. 3, 2014) ("In conjunction with the motion, defendants requested judicial notice of various documents, including NovelPoster's *ex parte* application for a temporary restraining order in this case and this Court's subsequent order. . . .  Defendants' request for judicial notice of the TRO application and order is GRANTED"); *In re Linda Vista Cinemas, L.L.C.*, 442 B.R. 724, 740 n. 7 (Bankr. D. Ariz. 2010) (stating that "[t]he court takes judicial notice of its own records," specifically, a declaration attached to the opposition to a motion for preliminary injunction, citing *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980)).  Accordingly, the court grants Newhall Memorial's request for judicial notice of the complaint in this action, "although [Newhall Memorial] [is] advised for future reference that [it]

---

[39]Def.'s RJN, Exh. A.

1  need not seek judicial notice of documents previously filed in the same case.  An accurate citation

2  will suffice." *NovelPoster*, 2014 WL 5594969 at *4 n. 7.

3          Newhall Memorial also requests that the court take judicial notice of Wage Order No. 5-

4  2001 of the California Industrial Welfare Commission ("IWC").[40]  Industrial Wage Orders of the

5  California IWC can be judicially noticed.  See *Stitt v. San Francisco Mun. Transp. Agency*, No.

6  12-CV-03704 YGR, 2013 WL 121259, *3 (N.D. Cal. Jan. 8, 2013) ("Here, judicial notice of

7  Wage Order 9, the SFMWO, and the San Francisco charter is appropriate as these documents are

8  matters of public record"); *Mendoza v. Home Depot, U.S.A. Inc.*, No. CV 09-05843 SJO (JCx),

9  2010 WL 424679, *3 (C.D. Cal. Jan. 21, 2010) ("Defendant requests that the Court take judicial

10  notice of . . . [IWC] Wage Order 4-2001 . . . .  Industrial Wage Orders are [ ] properly subject

11  to judicial notice pursuant to *City of Sausalito v. O'Neil*, 386 F.3d 1186, 1224 n. 2 (9th Cir.

12  2004). . . .  Accordingly, the Court takes judicial notice of the [ ] above-mentioned document[ ]");

13  *Veliz v. Cintas Corp.*, No. C 03-1180 RS, 2009 WL 1107702, *3 n. 3 (N.D. Cal. Apr. 23, 2009)

14  (taking judicial notice, *inter alia*, of an IWC wage order); see also *Sausalito v. O'Neil*, 386 F.3d

15  1186, 1224 n. 2 (9th Cir. 2004) ("We may take judicial notice of a record of a state agency not

16  subject to reasonable dispute," citing *Mack v. S. Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282

17  (9th Cir. 1986) (court may take judicial notice of records and reports of state administrative

18  bodies), overruled on other grounds by *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104

19  (1991)); *Cardenas v. McLane Food Services, Inc.*, 796 F.Supp.2d 1246, 1251 n. 1 (C.D. Cal.

20  2011) (taking judicial notice of an opinion letter of the California Department of Labor Standards

21  Enforcement).  Accordingly, the court grants Newhall Memorial's request and takes judicial notice

22  of IWC Wage Order 5-2001.

---

[40]*Id.*, Exh. B.

11

## II.  DISCUSSION

### A.    Vasserman's Evidentiary Objections

#### 1.    Declaration of Mark Puleo in Support of Newhall Memorial's Notice of Removal

Before addressing the merits of the parties' respective motions, the court first considers various evidentiary objections Vasserman asserts to declarations submitted by Newhall Memorial in support of its notice of removal and in opposition to Vasserman's motion to remand.[41] Vasserman first objects to consideration of certain portions of the declaration of Mark Puleo, Vice President and Chief Human Resources Officer at Newhall Memorial.[42]  Her objections concern Paragraphs 3,[43] 4,[44] 5,[45] 6,[46] and 7[47] of the declaration.

---

[41]See Plaintiff's Objections to Declarations Filed in Support of Defendant's Notice of Removal ("Objections"), Docket No. 13-4 (Sept. 8, 2014).

[42]Id. at 2-6; see Declaration of Mark Puleo in Support of Defendant's Notice of Removal ("Puleo Decl."), Docket No. 1-2 (Aug. 8, 2014).

[43]See Puleo Decl., ¶ 3 ("According to the Company's records, Plaintiff Tanya Vasserman ('Plaintiff') was employed by Henry Mayo from March 10, 2014 to April 3, 2014").

[44]See id., ¶ 4 ("According to the records maintained by the Company, Henry Mayo has employed approximately 2,530 non-exempt employees in the State of California since June 18, 2010.  According to the records maintained by the Company, such persons have received approximately 140,039 paychecks during that time and have had an average hourly rate of pay of $32.39").

[45]See id., ¶ 5 ("Plaintiff and the persons she seeks to represent in this lawsuit have been represented by two unions during the period of time for which Plaintiff's Complaint seeks relief. Specifically, Plaintiff and some other employees were represented by the California Nurses Association ('CNA').  Other employees who Plaintiff seeks to represent were represented by the United Electrical, Radio & Machine Workers of America ('UE')").

[46]See id., ¶ 6 ("Henry Mayo and the two unions have negotiated several CBAs during the time for which Plaintiff seeks relief.  True and correct copies of the CBAs with CNA are attached hereto as Exhibits A and E.  True and correct copies of the CBAs with UE are attached hereto as Exhibits C and D").

[47]See id., ¶ 7 ("The CBAs attached hereto as Exhibits A-D contain grievance and arbitration provisions").

12

1    Vasserman objects to these paragraphs on the grounds that they (1) constitute inadmissible

2    hearsay under Rules 801 and 802 of the Federal Rules of Evidence; (2) have not been

3    authenticated under Rule 901; (3) constitute expert opinion by a person not qualified to offer

4    expert testimony under Rules 701, 702, and 704; (4) are unduly prejudicial under Rule 403; (5)

5    are irrelevant under Rule 401; and (6) lack foundation under Rule 602.  None of these objections

6    has merit.

7        Puleo states, under penalty of perjury, that the statements in the declaration are based on

8    personal knowledge he has gained as Newhall Memorial's Vice President and Chief Human

9    Resources Officer; this provides adequate foundation for the statements.  See FED.R.EVID. 602

10   ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding

11   that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge

12   may consist of the witness's own testimony"); *Barthelemy v. Air Line Pilots Ass'n.*, 897 F.2d 999,

13   1018 (9th Cir. 1990) (concluding that a CEO's personal knowledge of various corporate activities

14   could be presumed).  Indeed, Puleo explains that many of his statements are based on his review

15   of Newhall Memorial records that are available to him as Vice President and Chief Human

16   Resources Officer.[48]   Moreover, Puleo's statements about the unions representing Newhall

17   Memorial employees and the collective bargaining agreements to which they were a party is the

18   type of information that would reasonably be known to Puleo as Chief Human Resources Officer.

19   See, e.g., *In re Kaypro*, 218 F.3d 1070, 1075 (9th Cir. 2001) ("Griesbach's five-year tenure as

20   Arrow's credit manager lends support to his claim of 'personal knowledge' of industry practice");

21   *Barthelemy*, 897 F.2d at 1018; *Chavez v. Amerigas Propane, Inc.*, No. CV 12-07524 MMM (Ex),

22   2013 WL 25882, *1 n. 5 (C.D. Cal. Jan. 2, 2013) (overruling objections to the declaration of

23   Amerigas' Senior Counsel, who stated that Amerigas' headquarters were in King of Prussia,

24   Pennsylvania, because, "as senior counsel for Amerigas, it is reasonable to believe that [the

25   declarant] knows the location of the corporation's headquarters").   Accordingly, the court

26   overrules Vasserman's foundation objection to Puleo's declaration.

27

28       [48]*Id.*, ¶¶ 4-5.

1    The statements in Puleo's declaration are, moreover, relevant because they bear directly

2    on whether the court has subject matter jurisdiction.  See FED.R.EVID. 401 ("Evidence is relevant

3    if: (a) it has any tendency to make a fact more or less probable than it would be without the

4    evidence; and (b) the fact is of consequence in determining the action").  Puleo's declaration

5    makes it more likely that Vasserman's claims are preempted and/or that the requirements for

6    removal under the Class Action Fairness Act are satisfied.  Vasserman's relevance objection is

7    thus overruled.

8    Even if evidence is relevant, of course, the court may exclude it under Rule 403 "if its

9    probative value is substantially outweighed by a danger of one or more of the following: unfair

10   prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly

11   presenting cumulative evidence."  Undue prejudice means an "undue tendency to suggest decision

12   on an improper basis, commonly, though not necessarily, an emotional one."  FED.R.EVID. 403,

13   Advisory Committee Notes, 1972 Proposed Rules.  See also *United States v. Old Chief*, 519 U.S.

14   172, 180 (1997).  The statements to which Vasserman objects are not unduly prejudicial as that

15   term is used in Rule 403.  Vasserman does not explain how she will be unfairly prejudiced by

16   Puleo's statements, and the court can discern no unfair prejudice that court result.  See *Dollar v.*

17   *Long Mfg., N. C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977) ("'[U]nfair prejudice' as used in Rule

18   403 is not to be equated with testimony simply adverse to the opposing party.  Virtually all

19   evidence is prejudicial or it isn't material.  The prejudice must be 'unfair'"), cert. denied, 435

20   U.S. 996 (1978).  Even if there were some *unfair prejudice*, moreover, it would not *substantially*

21   *outweigh* the probative value of the statements.  The court therefore overrules Vasserman's Rule

22   403 objection to Puleo's declaration.

23   Similarly unavailing are Vasserman's objections under Rules 701, 702, 704, 801, 802, and

24   901 of the Federal Rules of Evidence.  Puleo's statements do not constitute expert opinion.  Rule

25   702 of the Federal Rules of Evidence governs the admission of expert testimony.  Under Rule

26   702,

27       "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact

28       to understand the evidence or to determine a fact in issue, a witness qualified as an

14

1   expert by knowledge, skill, experience, training, or education, may testify thereto

2   in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient

3   facts or data, (2) the testimony is the product of reliable principles and methods,

4   and (3) the witness has applied the principles and methods reliably to the facts of

5   the case." FED.R.EVID. 702.

6   See also *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002) ("[Rule 702] consists of

7   three distinct but related requirements: (1) the subject matter at issue must be beyond the common

8   knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state

9   of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion"); *Sterner*

10  *v. U.S. Drug Enforcement Agency*, 467 F.Supp.2d 1017, 1033 (S.D. Cal. 2006) ("There are three

11  basic requirements that must be met before expert testimony can be admitted.  First, the evidence

12  must be useful to a finder of fact.  Second, the expert witness must be qualified to provide this

13  testimony.  Third, the proposed evidence must be reliable or trustworthy" (citations omitted)).

14      In contrast, Rule 701 permits lay opinion testimony that is "(a) rationally based on the

15  witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining

16  a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within

17  the scope of Rule 702." FED.R.EVID. 701.  Rule 701's requirement that opinion testimony be

18  based on a witness's perception derives from Rule 602.  That rule states in pertinent part that "[a]

19  witness may testify to a matter only if evidence is introduced sufficient to support a finding that

20  the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may

21  consist of the witness's own testimony." FED.R.EVID. 602.

22      Puleo's statements are based on personal knowledge; they are not the product of "scientific,

23  technical, or other specialized knowledge."  That Puleo knows the information as a result of his

24  work for Newhall Memorial does not convert factual observations into expert testimony.  Courts

25  routinely permit witnesses to offer lay opinion testimony concerning matters they learn or

26  experience they gain as a result of their employment.  See *In re Google AdWords Litigation*, No.

27  5:08–CV–3369 EJD, 2012 WL 28068, *5 (N.D. Cal. Jan. 5, 2012) ("Plaintiffs contend, however,

28  that Dr. Varian's declaration also contains opinions that should be stricken as expert testimony in

1   violation of Rule 26 disclosures.  According to Plaintiffs, Dr. Varian should not be permitted to

2   opine, among other things, that there is 'no overall or set price that could be applied uniformly

3   across hundreds of thousands of advertisers in the class.'. . .  Defendant responds that the primary

4   purpose of Varian's Declaration is to explain to the Court how advertisers are charged for the

5   advertisements placed through Google AdWords, the subject matter of this litigation.

6   Additionally, Defendants argue that Dr. Varian's personal knowledge and experience permits him

7   to make certain assertions as a lay witness under Rule 701.  The Court will admit Dr. Varian's

8   testimony regarding his knowledge of how the AdWords system works and his experience

9   applying economic modeling to study the AdWords System.  As Google's Chief Economist, Dr.

10  Varian is qualified to explain, as a lay witness, what Google's AdWords system does, how it

11  behaves, and what it does when certain variables are changed.  Here, just because the underlying

12  facts and data are technical does not transform the information into 'expert testimony' when those

13  facts are within the personal knowledge and experience of the company's employee.  Dr. Varian

14  may offer lay witness opinions regarding Google's business, so long as those opinions are based

15  on his own personal, particularized knowledge and experience relating to his employment at

16  Google," citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175-76 (3d Cir. 1993);

17  *Minority Television Project, Inc. v. FCC*, 649 F.Supp.2d 1025, 1032 (N.D. Cal. 2009); *Hynix*

18  *Semiconductor, Inc. v. Rambus, Inc.*, Nos. CV-00-20905 RMW, C 05-00334 RMW, C-06-00244,

19  2008 WL 504098, *5 (N.D. Cal. Feb. 19, 2008)); see also *United States v. Munoz-Franco*, 487

20  F.3d 25, 35 (1st Cir. 2007) ("Under Rule 701, courts have allowed lay witnesses to express

21  opinions about a business 'based on the witness's own perceptions and knowledge and

22  participation in the day-to-day affairs of [the] business,'" citing *United States v. Polishan*, 336

23  F.3d 234, 242 (3d Cir. 2003)).

24      Moreover, although Puleo provides calculations concerning the number of putative class

25  members, the approximate number of paychecks they received, and their average hourly rate of

26  pay, none of this information concerns subject matter "beyond the common knowledge of the

27  average layman," such that Puleo would have to qualify as an expert.  Vasserman does not explain

28  why simple mathematical calculations constitute expert testimony.  Although she contends that

1  Puleo must be "an expert qualified to provide an opinion as to . . . who constitutes [a] class
2  member[ ],"[49] the court does not agree.  As discussed *infra*, the identity of putative class members
3  can be determined based on the class definitions alleged in the complaint.  Vasserman also argues
4  that Puleo "has not established himself as an expert to testify as to the grievance and arbitration
5  provisions [of the collective bargaining agreements ("CBAs")] or whether the grievance and
6  arbitration provisions cover the alleged Labor Code violations, as asserted in Plaintiff's
7  Complaint."[50]  Contrary to Vasserman's assertion, Puleo does not testify "as to" the substance of
8  the grievance and arbitration provisions or whether they "cover the alleged Labor Code
9  violations"; he merely notes that the agreements contain such provisions.[51]  A declarant need not
10  be an expert witness to offer this type of testimony.  The court therefore concludes that Puleo does
11  not offer expert testimony and overrules Vasserman's objections under Rules 701, 702, and 704.

12      Vasserman objects finally that the challenged paragraphs of Puleo's declaration contain
13  inadmissible hearsay and lack authentication.  She offers no substantive argument supporting the
14  objections and the court finds no basis for them.  Puleo is not recounting an out-of-court statement
15  to prove the truth of the matter asserted; rather, he testifies based on personal knowledge of
16  Vasserman's personnel files.  Cf. FED.R.EVID. 801(c)("'Hearsay' means a statement that: (1) the
17  declarant does not make while testifying at the current trial or hearing; and (2) a party offers in
18  evidence to prove the truth of the matter asserted in the statement").  Moreover, it is unclear what
19  portions of Puleo's statements Vasserman contends must be authenticated.  Accordingly the court
20  overrules Vasserman's authentication objection.  See, e.g., *Burch v. Regents of University of*
21  *California*, 433 F.Supp.2d 1110, 1123-24 (E.D. Cal. 2006) ("Because defendants only generally
22  raise this objection without specifying which of the numerous exhibits . . . are actually not self
23  authenticating, the court overrules this objection.  The burden is on defendants to state their
24  objections with specificity. Cf. 10B Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE

---

[49]Objections at 3-5.

[50]*Id.* at 6.

[51]Puleo Decl, ¶ 7.

17

1  § 2738 ('It follows that a motion to strike should specify the objectionable portions of the affidavit

2  and the grounds for each objection.  A motion asserting only a general challenge to an affidavit

3  will be effective.')  Moreover, because defendants do not actually dispute the authenticity of these

4  documents, the court is confident plaintiff *would* be able to authenticate them at trial" (emphasis

5  added)).

6       For the reasons stated, the court overrules each of Vasserman's objections to Puleo's

7  declaration and will consider the declaration in its entirety in ruling on the motion to remand.

8               **2.    Declarations of Angela Watkins and Rolando Bergado in Support of**

9                       **Newhall Memorial's Notice of Removal**

10      Vasserman also objects to portions of the declarations of Angela Watkins[52] and Rolando

11  Bergado[53] filed in support of Newhall Memorial's notice of removal.[54]  Specifically, she objects

12  to Paragraphs 3,[55] 4,[56] and 5[57] of Watkins' declaration.   She objects to the same paragraphs of

13  Bergado's declaration.[58]  Vasserman asserts that the challenged statements are "unfairly prejudicial

---

15      [52]Declaration of Angela Watkins in Support of Notice of Removal ("Watkins Decl."),
16  Docket No. 1-8 (Aug. 8, 2014).

17      [53]Declaration of Rolando Bergado in Support of Notice of Removal ("Bergado Decl."),
   Docket No. 1-7 (Aug. 8, 2014).

18
19      [54]See Objections at 6-10.

20      [55]See Watkins Decl., ¶ 3 ("Although I was employed by Henry Mayo in California, I do
   not currently reside there and it is not my intention to reside there").

21
22      [56]See *id.*, ¶ 4 ("In fact, I moved to Maryland in January 2014 then recently moved to
   Indiana [on] July 4, 2014, and it is my intention to continue to reside in the State of Indiana
23  indefinitely.  I am in the process [of] obtain[ing] my driver's license in Indiana and I plan on
   registering to vote there.  After [my] divorce, [m]y personal belongings are in Maryland").

24
25      [57]See *id.*, ¶ 5 ("The above statements were true on June 18, 2014, and they continue to be
   true today").

26      [58]See Bergado Decl., ¶ 3 ("Although I was employed by Henry Mayo in California, I do
27  not currently reside there and it is not my intention to reside there"); *id.*, ¶ 4 ("In fact, I have
   lived in the State of Illinois since April 2013, and it is my intention to continue to reside in the
28  State of Illinois indefinitely.  I have had an Illinois driver's license since June 7, 2013, and I am

18

1    as [d]efendant has not established that [Watkins or Bergado] is a 'class member' per 28 U.S.C.

2    § 1332(d)(1)(D) . . . within the definition of the proposed class in [p]laintiff's complaint."  On this

3    basis, she contends that their citizenship and residence are "irrelevant in determining CAFA

4    jurisdiction."[59]

5         As discussed *infra*, Vasserman's assertion that neither Watkins nor Bergado is a putative

6    class member as defined in the complaint is unavailing; their statements are thus relevant because

7    they make it more probable that minimal diversity exists between Newhall Memorial and the

8    putative class members.  See FED.R.EVID. 401 (evidence is relevant if it has "any tendency to

9    make the existence of any fact . . . more or less likely that it would be without the evidence").

10   The court thus overrules Vasserman's relevance objection to the Watkins and Bergado

11   declarations.  It similarly overrules her objection under Rule 403.  Vasserman does not explain

12   how she will be unfairly prejudiced by consideration of the Watkins and Bergado declarations;

13   rather, it appears the only form of "prejudice" she will suffer is that the declarations make it less

14   likely her remand motion will be granted.  As noted, the fact that evidence is adverse to a party's

15   position does not support its exclusion under Rule 403; rather, the evidence must result in "unfair

16   prejudice."  See *Old Chief*, 519 U.S. at 180 (unfair prejudice means an "undue tendency to

17   suggest decision on an improper basis, commonly, though not necessarily, an emotional one,"

18   quoting FED.R.EVID. 403, Advisory Committee Notes, 1972 Proposed Rules).  See also *United*

19   *States v. Munoz*, 36 F.3d 1229, 1233 (1st Cir. 1994) ("The damage done to the defense is not a

20   basis for exclusion; the question under Rule 403 is 'one of "unfair" prejudice – not of prejudice

21   alone'"); *Dollar*, 561 F.2d at 618.  Consequently, the court overrules Vasserman's Rule 403

22   objection to Watkins' and Bergado's declarations.

23   _____

24   not registered to vote in the United States.  My personal belongings are in Chicago, Illinois"); *id.*,
     ¶ 5 ("The above statements were true on June 18, 2014, and they continue to be true today").

25

26   [59]Objections at 6-10.  Vasserman lists a number of additional objections to Watkins' and
     Bergado's statements: (1) hearsay under Rules 801 and 802 of the Federal Rules of Evidence;

27   (2) lack of authentication under Rule 901; (3) unqualified expert opinion under Rules 701, 702,
     and 704; and (4) lack of foundation under Rule 602.  (*Id.*)  As Vasserman provides no argument

28   or explanation of the basis for these objections, the court overrules them.

1      **B.      Vasserman's Motion to Remand**

2              **1.      Legal Standard Governing Removal Jurisdiction**

3              The right to remove a case to federal court is entirely a creature of statute.  See *Libhart v.*

4      *Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir. 1979).  The removal statute, 28 U.S.C.

5      § 1441, allows defendants to remove when a case originally filed in state court presents a federal

6      question or is between citizens of different states and involves an amount in controversy that

7      exceeds $75,000.  See 28 U.S.C. §§ 1441(a), (b); see also 28 U.S.C. §§ 1331, 1332(a).  A case

8      presents a "federal question" if a claim "'aris[es] under the Constitution, laws, or treaties of the

9      United States.'"  *Sullivan v. First Affiliated Securities, Inc.*, 813 F.2d 1368, 1371 (9th Cir. 1987)

10     (quoting 28 U.S.C. § 1331).   Only state court actions that could originally have been filed in

11     federal court may be removed.  28 U.S.C. § 1441(a); see *Caterpillar, Inc. v. Williams*, 482 U.S.

12     386, 392 (1987); *Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1393 (9th Cir. 1988).

13     Whether removal jurisdiction exists must be determined by reference to the "well-pleaded

14     complaint."  *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 808 (1986).  The

15     well-pleaded complaint rule makes plaintiff the "master of the claim."  *Caterpillar*, 482 U.S. at

16     392.   Thus, where plaintiff can state claims under both federal and state law, she can prevent

17     removal by ignoring the federal claim and alleging only state law claims.  *Rains v. Criterion*

18     *Systems, Inc.*, 80 F.3d 339, 344 (9th Cir. 1996).[60]

19             There is an exception to the "well pleaded complaint" rule, however.  Under the "artful

20     pleading" doctrine, a plaintiff cannot defeat removal of a federal claim by disguising or pleading

21

22             [60]It is not enough for removal purposes that a federal question may arise in connection with

23     a defense or counterclaim.  "[F]ederal jurisdiction exists only when a federal question is presented

24     on the face of the plaintiff's properly pleaded complaint."  *Caterpillar*, 482 U.S. at 392.  See also

       *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152 (1908).  "A defense is not part of

25     a plaintiff's properly pleaded statement of his or her claim."  *Rivert v. Regions Bank of La.*, 522

26     U.S. 470, 475 (1998).  See also *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987).

       Thus, "a case may not be removed to federal court on the basis of a federal defense, . . . even if

27     the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the

28     defense is the only question truly at issue in the case."  *Franchise Tax Bd. of State of Cal. v.*

       *Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 14 (1983).

it artfully as a state law cause of action.  If the claim arises under federal law, the federal court will recharacterize it and uphold removal.  *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398 n. 2 (1981); *Schroeder v. TransWorld Airlines, Inc.*, 702 F.2d 189. 191 (9th Cir. 1983).  The "artful pleading" doctrine applies to state claims that are completely preempted by federal law. See *Caterpillar*, 482 U.S. at 393 ("Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law"); *ARCO Environmental Remediation, L.L.C. v.Department of Health & Environmental Quality of Montana*, 213 F.3d 1108, 1114 (9th Cir. 2000) ("A state-created cause of action can be deemed to arise under federal law . . . where federal law completely preempts state law").

        To support a finding of complete preemption, the preemptive force of the federal statute at issue must be "extraordinary."  See *Metropolitan Life Ins. Co.*, 481 U.S. at 65; *Holman v. Laulo-Rowe Agency*, 994 F.2d 666, 668 (9th Cir. 1993) ("The [complete preemption] doctrine applies in select cases where the preemptive force of federal law is so 'extraordinary' that it converts state common law claims into claims arising under federal law for purposes of jurisdiction," citing *Caterpillar*, 482 U.S. at 386).  For this reason, the complete preemption doctrine is narrowly construed.  See *Holman*, 994 F.2d at 668 ("The [complete preemption] doctrine does not have wide applicability; it is a narrow exception to the 'well-pleaded complaint rule'"); *Gatton v. T-Mobile USA, Inc.*, No. SACV 03-130 DOC, 2003 WL 21530185, *5 (C.D. Cal. Apr. 18, 2003) ("The complete preemption doctrine is, however, extremely narrow," citing *TPS Utilicom Services, Inc. v. AT & T Corp.*, 223 F.Supp.2d 1089, 1097 (C.D. Cal. 2002)).  "[O]nly three areas have been deemed areas of complete preemption by the United States Supreme Court: (1) claims under the Labor Management Relations Act [LMRA]; (2) claims under the Employment Retirement and Insurance Security Act (ERISA); and (3) certain Indian land grant rights."  *Gatton*, 2003 WL 21531085 at *5; see also *Robinson v. Michigan Consolidated Gas Co., Inc.*, 918 F.2d 579, 585 (9th Cir. 1990) ("complete preemption . . . is extremely limited, existing only where a claim is preempted by [the LMRA]; where a state law claim alleges a present right

1 to possession of Indian tribal lands; and where state tort or contract claims are preempted by
2 [ERISA]" (internal citations omitted)).

3            **2.    Whether the Court Has Federal Question Jurisdiction**

4                  **a.    Legal Standard Governing § 301 Preemption**

5         Section 301(a) of the LMRA gives federal courts exclusive jurisdiction to hear "[s]uits for
6 violation of contracts between an employer and a labor organization." 29 U.S.C. § 185(a).  See
7 *Franchise Tax Bd.*, 463 U.S. at 23 ("The preemptive force of § 301 is so powerful as to displace
8 entirely any state cause of action 'for violation of contracts between an employer and a labor
9 organization.' Any such suit is purely a creature of federal law, notwithstanding the fact that state
10 law would provide a cause of action in the absence of § 301"); see also *Caterpillar*, 482 U.S. at
11 394 ("Section 301 governs claims founded directly on rights created by collective-bargaining
12 agreements, and also claims 'substantially dependent on analysis of a collective-bargaining
13 agreement,'" quoting *Electrical Workers v. Hechler*, 481 U.S. 851, 859 n. 3 (1987)).  Section 301
14 "mandate[s] resort to federal rules of law in order to ensure uniform interpretation of collective-
15 bargaining agreements, and thus to promote the peaceable, consistent resolution of labor-
16 management disputes." *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 404 n. 3
17 (1988).

18         To further the goal of uniform interpretation of labor contracts, the preemptive effect of
19 § 301 has been extended beyond suits that allege the violation of a collective bargaining
20 agreement.  See *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210-11 (1985) ("The interests in
21 interpretive uniformity and predictability that require that labor-contract disputes be resolved by
22 reference to federal law also require that the meaning given a contract phrase or term be subject
23 to uniform federal interpretation").  Thus, a state law claim will be preempted if it is so
24 "inextricably intertwined" with the terms of a labor contract that its resolution will require judicial
25 interpretation of those terms.  *Id.* at 213 (holding that a claim for breach of the duty of good faith
26 and fair dealing was preempted by § 301 because "good faith" and "fair dealing" had to be
27 assessed with reference to the contractual obligations of the parties).

28

Despite the broad preemptive effect of § 301, a claim that seeks to vindicate "nonnegotiable state-law rights . . . independent of any right established by contract" is not within its scope. *Allis-Chalmers Corp.*, 471 U.S. at 213; see also *Livadas v. Bradshaw*, 512 U.S. 107, 123-24 (1994) ("[Section] 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law. . . .  [I]t is the legal character of a claim, as 'independent' of rights under the collective-bargaining agreement . . . that decides whether a state cause of action may go forward" (citations omitted)).[61]  As a result, if a state law cannot be waived or modified by private contract, and if the rights it creates can be enforced without resort to the particular terms, express or implied, of a labor contract, § 301 does not preempt the claim for violation of the law.  See *Miller v. AT & T Network Systems*, 850 F.2d 543, 546 (9th Cir. 1988).  "If the claim is plainly based on state law, § 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense."  *Cramer v. Consolidated Freightways, Inc.*, 255 F.3d 683, 691 (9th Cir. 2001) (en banc), cert. denied 534 U.S. 1078 (2002).

Nor can a defendant invoke preemption merely by alleging a "hypothetical connection between the claim and the terms of the CBA," or a "creative linkage" between the subject matter of the suit and the wording of the CBA.  *Id.* at 691-92.  To prevail, "the proffered interpretation argument must reach a reasonable level of credibility."  *Id.* at 692.  A preemption argument is not credible "simply because the court may have to consult the CBA to evaluate [a plaintiff's claim]; [similarly,] 'look[ing] to' the CBA merely to discern that none of its terms is reasonably in dispute does not require preemption."  *Id.* (quoting *Livadas*, 512 U.S. at 125).  In *Cramer*, the Ninth Circuit clarified the scope of the LMRA's preemptive effect:

> "To the extent our prior cases held or implied that preemption was proper because
> of the mere possibility that the subject matter of the claim was a proper subject of

_____

[61]The Supreme Court in *Livadas* held that the state law claim asserted in that case required only that the court "look to" the CBA to determine the applicable rate of pay.  It concluded the fact that there was "no indication . . . there was a 'dispute'" regarding the rate of pay "foreclose[d] even a colorable claim" of preemption.  *Livadas*, 512 U.S. at 124-25.

1    the collective bargaining process, whether or not specifically discussed in the CBA,

2    we today hold such statements to be an incorrect articulation of § 301 preemption

3    principles.  A state law claim is not preempted under § 301 unless it necessarily

4    requires the court to interpret an existing provision of a CBA that can reasonably

5    be said to be relevant to the resolution of the dispute." *Id.* at 693.

6    See also *Humble v. Boeing Co.*, 305 F.3d 1004, 1007-08 (9th Cir. 2002) (recognizing that *Cramer*

7    "revised [the] framework for analyzing § 301 preemption and synthesized the considerations

8    involved").

9        The Ninth Circuit has articulated a two-part test to determine whether a cause of action is

10   preempted by the LMRA.  *Burnside v. Kiewit Pacific Corp.*, 491 F.3d 1053, 1059 (9th Cir.

11   2007).  First, the court must determine "whether the asserted cause of action involves a right

12   conferred upon an employee by virtue of state law, not by a CBA.  If the right exists solely as a

13   result of the CBA, then the claim is preempted, and . . . analysis ends. . . .  If however, the right

14   exists independently of the CBA, [the court] must still consider whether it is nevertheless

15   'substantially dependent on analysis of a collective-bargaining agreement.'  If such dependence

16   exists, then the claim is preempted by section 301; if not, then the claim can proceed under state

17   law." *Id.* at 1059-60 (citations omitted).

18                          **b.    Whether Vasserman's Claims are Preempted**

19       Vasserman alleges state law claims for unfair business practices under California Business

20   and Professions Code § 17200 *et seq.*; failure to pay overtime compensation in violation of

21   California Labor Code §§ 204, 510, 1194, 1198; waiting time penalties under California Labor

22   Code § 200 *et seq.*;[62] failure to provide accurate itemized wage statements in violation of

23

24       [62]Although Vasserman does not specify the section of the Labor Code under which she
25   seeks waiting time penalties, given the substance of her allegations, she likely seeks waiting time
     penalties under California Labor Code § 203.  (Compare Complaint, ¶ 59 ("Plaintiff and other
26   former employees of Defendant employed in the State of California separated from employment
     with Defendant.  Plaintiff and all others similarly situated did not timely receive a final pay check
27   from Defendant in violation of Labor Code §§ 200 *et seq.*  Plaintiff is informed and believes and
28   thereon alleges that Defendant also violated the mandates of Labor Code §§ 200 *et seq.*, as to

California Labor Code § 226; failure to provide meal breaks in violation of California Labor Code § 226.7; civil penalties under PAGA, California Labor Code §§ 2698-99; and failure to pay all wages due to illegal rounding in violation of California Labor Code §§ 510(a) and 1194, and IWC Wage Order 5-2001.[63]   The court considers whether these claims are preempted by § 301 of the LMRA *seriatim* below.

**(1)   Whether Vasserman's Overtime Claim is Preempted**

Vasserman contends that her second claim for failure to provide overtime compensation in violation of California Labor Code §§ 204, 510, 1194, 1198 is "based on and conferred by substantive non-waivable rights under state law – specifically, the California Labor Code – and not by rights or duties under [Newhall Memorial's] CBAs."[64]   The claim rests on allegations that Newhall Memorial had a policy of failing to pay all compensable time and overtime due, including, at times, failing to pay proper straight time and overtime pay for hours worked by Vasserman and putative class members.[65]   Newhall Memorial counters that Labor Code § 510 "does not apply to [Vasserman's] overtime claims" because it satisfies a statutory exemption set forth in Labor Code § 514.[66]   Because § 510 does not apply, Newhall Memorial asserts that

---

other employees whose employment ended during the period of time covered by this action); *id.*, ¶ 60 ("Pursuant to Labor Code §§ 200 *et seq.*, each member of the classes that no longer works for Defendant, and who was not timely paid is entitled to one (1) day of pay in penalties for each day that he or she was paid late, until payment was made, up [to] a maximum of thirty (30) days") with CAL. LAB. CODE § 203(a) ("If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days. . . ."). Accordingly, the court treats Vasserman's claim for waiting time penalties as a claim for violation of Labor Code § 203.

[63]Complaint, ¶¶ 24-99.

[64]Motion to Remand at 6-7.

[65]Complaint, ¶¶ 27-28.

[66]Remand Opp. at 7-8.

1    Vasserman's overtime rights can "only arise from interpretation of the CBA," and thus that the

2    under *Burnside*, the claim is preempted under § 301 of the LMRA.

3            The CBAs suggest that Vasserman's claim may be based on a statute that does not apply.

4    Labor Code § 514 exempts from §§ 510 and 511 employees covered by CBAs if certain conditions

5    are met:

6            "Section 510 and 511 do not apply to an employee covered by a valid collective

7            bargaining agreement if the agreement expressly provides for the wages, hours of

8            work, and working conditions of the employees, and if the agreement provides

9            premium wage rates for all overtime hours worked and a regular hourly rate of pay

10           for those employees of not less than 30 percent more than the state minimum

11           wage." CAL. LAB. CODE § 514.

12   Section 514 is an affirmative defense that must be pled and proved by Newhall Memorial. See

13   *Mireles v. Paragon Systems, Inc.*, No. 3:13-CV-00122-L-BGS, 2013 WL 3450090, *3-4 (S.D.

14   Cal. July 9, 2013) (denying a motion to strike a § 514 affirmative defense to plaintiff's overtime

15   claims); see also *Araquistain v. Pacific Gas & Electric Company*, 229 Cal.App.4th 227, 231

16   (2014) (recognizing that California Labor Code §§ 512(e)-(g), the statutory exemptions to meal

17   period violations, are affirmative defenses to a claim for violation of § 512(a)). Vasserman asserts

18   it is premature to determine whether § 514 applies because Newhall Memorial has not yet pled

19   the defense.[67]   The court need not finally decide the issue to determine jurisdiction for two

20   reasons. First, the fact that the § 514 exemption may apply does not alter the substance of

21   Vasserman's claim. If it is ultimately determined that § 514 applies, this will simply mean that

22   Vasserman has alleged a claim under a statute she cannot invoke, and under which she is unable

23   to recover. Stated differently, although Vasserman's claim may ultimately fail, the court is unable

24   to conclude that its resolution is substantially dependent on analysis of the CBAs when the

25

26

27           [67]Plaintiff's Reply in Support of Plaintiff's Motion to Remand ("MTR Reply"), Docket No.

28   21 (Nov. 21, 2014) at 10.

supporting allegations focus only on state law.  Indeed, Vasserman specifically and repeatedly pleads violations of state law, not a violation of the CBAs or right they provide.[68]

Second, because, as noted, Newhall Memorial's reliance on § 514 is essentially a defense to Vasserman's overtime claim, it does not give rise to § 301 preemption.  See *Humble*, 305 F.3d at 1011 ("Boeing argues that when it offers a non-discriminatory justification for its conduct by relying on authorizing CBA provisions, that suffices to trigger preemption of Humble's reasonable accommodation claim.  This argument is unavailing after *Cramer*, which held that reliance on CBA provisions to defend against an independent state law claim does not trigger § 301 preemption").  Accordingly, the court finds that Vasserman's second claim is not preempted.

In so holding, the court reaches the same conclusion as several other courts in this district, each of which has recognized that "reliance on the CBA as an aspect of a defense is not enough to 'inject[ ] a federal question into an action that asserts what is plainly a state-law claim.'" *Placencia v. Amcor Packaging Distribution, Inc.*, No. SACV 14-0379 AG (JPRx), 2014 WL 2445957, *2 (C.D. Cal. May 12, 2014) (citing *Caterpillar*, 482 U.S. at 399).  These courts have rejected the arguments Newhall Memorial makes here – i.e., that an overtime claim arises under the CBA, rather than state law, when the defendant asserts an affirmative defense under § 514.

In *Placencia*, 2014 WL 2445957 at *2-3, for example, Judge Andrew Guilford remanded a wage and hour action to state court; he concluded that Placencia's overtime claim did not arise under the CBA despite the fact that Amcor had asserted a § 514 defense.  Amcor argued that its employees were "covered by a valid collective bargaining agreement," and that it was thus "exempt from California's state overtime laws" under § 514, leaving "[p]laintiff's only right to overtime one that arises from the CBA."  *Id.* at *2.  Judge Guilford noted that "'[Section] 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense.'" *Id.* (citing *Caterpillar*, 482 U.S. at 398-99; *Cramer*, 255 F.3d at 691).  Specifically, he reasoned that "whether [p]laintiff's claim fails requires interpreting state law, not the CBA."  As a consequence, Judge Guilford concluded that Amcor's defense to Placencia's § 510 overtime

---

[68]See, e.g., Complaint, ¶¶ 45-56.

1  claim was "not sufficient grounds for removal." *Id.* at *3 ("Plaintiff, as the master of his

2  complaint, has chosen to plead his overtime claim not under the CBA, but rather under California

3  law.  Amcor essentially argues Plaintiff can't plead such a claim.  That may be proper grounds

4  for demurrer, but it is not sufficient grounds for removal here").

5      Similarly, in *Bart v. Parkview Community Hospital Medical Center*, No. EDCV 14-01614

6  JGB (DTBx) (C.D. Cal. Sept. 18, 2014),[69] Judge Bernal rejected a contention that Parkview's

7  defensive reliance on the statutory exemption set forth in § 514 meant that Bart's overtime claim

8  for violation of the Labor Code arose under the CBA.  Judge Bernal noted that each of Bart's

9  claims clearly arose under state law; he found no preemption under the first step of the *Burnside*

10  analysis because "[p]laintiff allege[d] only state law claims and [did] not refer to CBAs anywhere

11  in the F[irst] A[mended] C[omplaint]." *Id.* at 4.  He also rejected Parkview's argument – nearly

12  identical to that advanced by Newhall Memorial here – that, because the governing CBAs

13  allegedly provided premium pay and satisfied § 514, the class's right to recovery arose from the

14  CBA.  *Id.* at 5.

15      The court finds the reasoning of Judges Guilford and Bernal instructive.  As the Ninth

16  Circuit has recognized, "[i]t is 'settled law that a case may not be removed to federal court on the

17  basis of a federal defense, including a defense of preemption, even if the defense is anticipated in

18  the plaintiff's complaint, and even if both parties concede that the federal defense is the only

19  question truly at issue.'" *Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1106

20  (9th Cir. 2000) (quoting *Franchise Tax Bd.*, 463 U.S. at 14).  Newhall Memorial, however,  seeks

21  to remove precisely on this basis.  Even if Newhall Memorial's § 514 defense ultimately prevails,

22  Vasserman's claim is premised on state law rights afforded by § 510, not on rights created by the

23  CBA.  *Humble*, 305 F.3d at 1008 ("[T]he plaintiff's claim is the touchstone for the preemption

24  analysis, and 'the need to interpret the CBA must inhere in the nature of plaintiff's claim' to

25  trigger preemption," citing *Cramer*, 255 F.3d 683).  See, e.g., *Morales v. Amcor Packaging*

26  *(USA), Inc.*, No. 2:14-CV-03612-ODW (AJW), 2014 WL 2931174, *4 (C.D. Cal. June 30, 2014)

27

28      [69]Pl.'s Reply RJN, Exh. 1.

("Here, the issue is whether Amcor provided meal and rest periods in accordance with California wage-and-hour law.  As a defense, Amcor may submit the CBA and argue that Morales and the rest of the class agreed to forgo off-duty meal and rest breaks.  However, a valid defense will not support removal to district court; it simply means that Amcor prevails in state court"); *Placencia*, 2014 WL 2445957 at *2 ("Amcor argues [that because] 'Plaintiff's only right to overtime is the one that arises from the CBA,' Plaintiff's claim is preempted, and this Court has jurisdiction.  But that's not true.  If Plaintiff's overtime claim under California law fails, that doesn't mean this Court has jurisdiction, it means Amcor wins.  Determining whether Plaintiff's claim fails requires interpreting state law, not the CBA.  *Gregory v. SCIE, LLC*, 317 F.3d 1050, 1053 (9th Cir. 2003).  And '[Section] 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense.'  *Cramer*, 255 F.3d at 691; *Caterpillar*, 482 U.S. at 398-99").

The Ninth Circuit's holding in *Firestone v. Southern California Gas Company*, 219 F.3d 1063 (9th Cir. 2000), is not to the contrary.  Plaintiffs were meter readers, whose unions negotiated "flat sums for completing meter reading routes of assigned lengths."  *Id.* at 1065. Meter readers who worked more than eight hours in a day "received an adjustment to the flat sum normally paid."  *Id.*  The agreement set forth a formula for determining  the number of overtime hours; defendant, however, calculated overtime pay a different way.  *Id.* at 1065-66.  "The district court held that one could not determine whether plaintiffs were receiving a 'premium wage rate' for overtime under the collective bargaining agreement – making them exempt from California overtime laws – without interpreting that agreement to determine, *inter alia*, what the regular rate was."  *Id.* at 1066.  The Ninth Circuit agreed.  It concluded that to resolve the parties' dispute, the court would have to interpret the terms of the CBA to determine if plaintiffs were receiving a premium wage for overtime, and based on that interpretation, decide if California's overtime exemption applied.  *Id.* at 1067 ("Because the collective bargaining agreement must be interpreted to determine whether the PPR document provides for premium wage rates for overtime work and, therefore, whether California's overtime exemption provision applies, . . . [p]laintiffs' state law claim is preempted by the LMRA").  Here, by contrast, no interpretation is required to determine

1   the applicability of the exemption.  The overtime provisions of the CBAs are straightforward and

2   clear.[70]

3   _____

4       [70]See, e.g., id., Exh. B at 26 ("8 & 40 Overtime Plans: For any Nurse assigned to the 8

5   & 40 Overtime Plan, for any time worked by that Nurse in excess of eight (8) hours in any one

6   work day, that Nurse shall be paid at the premium rate of one and one-half times the sum of that

7   Nurse's Base Hourly Pay Rate and any differential to which that Nurse is entitled pursuant to this

8   Agreement or to which the Hospital has assigned that Nurse as a management right pursuant to

9   the Management Rights provisions of this Agreement; for any Nurse assigned to the 8 & 40

10  Overtime Plan, for any time worked by that Nurse in excess of twelve (12) hours in any one work

11  day, that Nurse shall be paid at a premium rate of two times the sum of that Nurse's Base Hourly

12  Pay Rate and any differential to which that Nurse is entitled pursuant to this Agreement or to

13  which the Hospital has assigned that Nurse as a management right pursuant to the Management

14  Rights provisions of, this Agreement; for any nurse assigned to the 8 & 40 overtime Plan, for any

15  time worked by that Nurse in excess of forty (40) hours in any one week pay period, that Nurse

16  shall be paid at the premium rate of one and one-half times the sum of that Nurse's Base Hourly

17  Pay Rate and any differential to which that Nurse is entitled pursuant to this Agreement or to

18  which the Hospital has assigned that Nurse as a management right pursuant to the Management

19  Rights provision of this Agreement.  (For the purpose of calculating time worked in excess of 40

20  hours in any one week pay period, to prevent compounding of overtime the total amount of time

21  worked for that one week pay period shall be reduced by the total amount of time worked in

22  excess of 8 hours in each work day within that one week pay period)"); id., Exh. B at 27 ("10 &

23  40 Overtime Plan: For any Nurse assigned to the 10 & 40 Overtime Plan, for any time worked

24  by that Nurse in excess of ten (10) hours in any one work day, that Nurse shall be paid at a

25  premium rate of two times the sum of that Nurse's Base Hourly Pay Rate and any differential to

26  which that Nurse is entitled pursuant to this Agreement or to which the Hospital has assigned that

27  Nurse as a management right pursuant to the Management Rights provisions of this Agreement;

28  for any Nurse assigned to the 10 & 40 Overtime Plan, for any time worked by that Nurse in

    excess of forty (40) hours in any one week pay period, that Nurse shall be paid at a premium rate

    of one and one-half times the sum of that Nurse's Base Hourly Pay Rate and any differential to

    which that Nurse is entitled pursuant to this Agreement or to which the Hospital has assigned that

    Nurse a management right pursuant to the Management Rights provisions of this Agreement.  (For

    the purpose of calculating time worked in excess of 40 hours in any one week pay period, to

    prevent compounding of overtime, the total amount of time worked for that one week pay period

    shall be reduced by the total amount of time worked in excess of 10 hours in each work day within

    that one week pay period)"); id., Exh. B at 27-28 ("12 & 36 Overtime Plan: For any Nurse

    assigned to the 12 & 36 Overtime Plan, for any time worked by that Nurse in excess of twelve

    (12) hours in any one work day, that Nurse shall be paid at a premium rate of two times the sum

    of that Nurse's Base Hourly Pay Rate and any differential to which that Nurse is entitled pursuant

    to this Agreement or to which the Hospital has assigned that Nurse, as a management right

    pursuant to the Management Rights provisions of this Agreement; for any Nurse assigned to the

    12 & 36 Overtime Plan, for any time worked by that Nurse in excess of thirty-six (36) hours in

1   In this regard, the case is more like *Gregory v. SCIE, LLC*, 317 F.3d 1050 (9th Cir. 2003),

2   than it is like *Firestone*.   In *Gregory*, the Ninth Circuit considered whether an unpaid overtime

3   claim was preempted.   Gregory worked six consecutive days on television and motion picture

4   productions; he spent one day working on one production and five days working on another.   *Id.*

5   at 1051.   Gregory alleged that SCIE had violated the Labor Code by failing to pay overtime for

6   hours worked in excess of eight hours in one workday and forty hours in one workweek.   *Id.*   The

7   court concluded that Gregory's claim was based entirely on state law, and was not preempted.

8   *Id.* at 1053.   It explained: "While overtime is calculated in accordance with the terms of the CBA,

9   this case involves no issue concerning the method of calculation.   The issue here is not how

10   overtime rates are calculated but whether the result of the calculation complies with California

11   law, i.e., whether Gregory is paid at premium wage rates for" overtime work as required by

12   § 510.   *Id.*   The court distinguished *Firestone*, stating that "the parties' dispute is not over how

13   premium wage rates are calculated under the CBA, but whether Gregory is paid premium pay for

14   all the time for which he is entitled to premium pay under California law.   This dispute does not

15   require interpretation of the CBA."   *Id.* at 1054 n. 3.

16   Vasserman does not dispute the applicable wage rates that are provided in the CBA –

17   instead, she argues that she was not paid overtime as required by California law.   Although it is

18   apparent that calculations will be required to resolve her overtime claims given the three overtime

19   plans set forth in the CBAs,[71] Newhall Memorial fails to show that this will require *interpretation*

20   of the CBA, rather than reference to its undisputed terms.   See *Livadas*, 512 U.S. at 124 ("[W]hen

---

23   any one week pay period, that Nurse shall be paid at a premium rate of one and one-half times the
sum of that Nurse's Base Hourly Pay Rate and any differential to which that Nurse is entitled

24   pursuant to this Agreement or to which the Hospital has assigned that Nurse as a management
right pursuant to the Management Rights provisions of this Agreement.   (For the purpose of

25   calculating time worked in excess of 36 hours in any one week pay period, to prevent
compounding of overtime, the total amount of time worked for that one week pay period shall be

26   reduced by the total amount of time worked in excess of 12 hours in each work day within that

27   one week pay period)").

28   [71]See Puleo Opp. Decl., Exh. B at 26-29.

the meaning of contract terms is not subject to dispute, the bare fact that a collective bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished"). Based on those undisputed terms, the court will have to assess "whether when overtime is paid under the CBA it is paid for *all overtime hours worked*, as required by California law." *Gregory*, 317 F.3d at 1053.[72]

Although Newhall Memorial asserts that several terms of the CBAs require interpretation to determine whether it is entitled to invoke the exemption, the court is not persuaded.[73]  As respects Article 18 of the CBAs, which provides paid education leave for employees, Newhall Memorial argues that "[i]n analyzing [p]laintiff's argument, the [c]ourt would necessarily have to interpret the terms of the 'education leave' policy to determine whether it rendered Labor Code § 514 inapplicable, including whether the payments constitute 'wages' and what it means to pay 'straight time.'"[74]  In so asserting, Newhall Memorial seizes on Vasserman's contention in her motion that Article 18 does not expressly provide for wages earned by employees.[75]  As Newhall Memorial notes, however, the real question is whether "education leave" time constitutes "hours

---

[72]In *Coria v. Recology, Inc.*, __ F.Supp.2d __, 2014 WL 3885873 (N.D. Cal. Aug. 7, 2014), There, Judge James Donato concluded that plaintiff's meal period and overtime claims were preempted by § 301 because the meal period claim for violation of Labor Code § 512(a) was subject to the exemption set forth in § 512(e) for employees governed by a valid CBA, and the overtime claim under § 510 was subject to the statutory exemption set forth in § 514. *Id*. at *2-4. Judge Donato distinguished *Gregory* on the basis that plaintiff's overtime claim was based on the CBA and that, even if it did not, it was "substantially dependent upon" an analysis of that agreement. *Id*. at *5 n. 1.  Here, unlike in *Coria*, Vasserman's allegations make clear that her overtime claim is based on state law rights, not on the CBAs. See *Coria*, 2014 WL 3885873 at *4-5. More fundamentally, as noted, the CBAs' overtime provisions are clear and will not require interpretation to determine if the § 514 exemption applies.

[73]Vasserman contends that the provisions of the CBAs indicate that § 514 does not apply. Newhall Memorial asserts that the mere fact she makes this argument shows that the court must analyze and interpret the terms of the CBAs to determine if the statutory exemption applies. (MTR Opp. at 8-14.)  The court is similarly not persuaded by this argument.

[74]*Id*. at 9.

[75]Motion to Remand at 10-11.

1    worked" under California law, and whether premium compensation must be calculated by

2    including these hours in hours worked to determine if the CBAs satisfy the requirements for the

3    statutory exemption.   While such a determination may require reference to the CBAs, it will not

4    require interpretation or analysis of their terms.   As Newhall Memorial notes in its opposition,[76]

5    "hours worked" is defined by California law, not the CBAs.    The court need only look at the

6    education leave provision to determine whether, under state law, leave time constitutes

7    compensable hours worked.[77]

8         Similarly, the court is not convinced that the CBAs' "on call/uncontrolled standby"

9    provisions require interpretation to determine whether § 514 applies.[78]  Newhall Memorial asserts

10   that it is necessary to interpret Article 14, Section I to determine whether the CBAs provide pay

11   for straight time and premium pay for "all overtime hours worked," as required to invoke § 514.[79]

12   Article 14, Section I provides:

13        "**On Call (Uncontrolled Standby):** Time spent by a Nurse placed on on-call status

14        (Uncontrolled Standby) shall not be treated as time worked for that Nurse's

15        compensation, benefits, or any other purpose; provided, however, time spent by a

16        Nurse on on-call status (Uncontrolled Standby) shall be paid to the Nurse at the

17        hourly rate of $8.00.   Any Nurse who is on-call status and receives a call and

18

19   ──────────────

20        [76]MTR Opp. at 9-10.

21        [77]The court finds no merit to Vasserman's contention that Article 18 demonstrates that the
     CBAs do not "expressly provide" for employee wages.  (Motion to Remand at 10-11.)  If it is
22   determined that education leave time is compensable, which as noted requires interpretation of
     state law rather than the CBAs, the agreement clearly provides the wage the employee on leave
23   will be paid.  Specifically, it provides for up to "twenty (20) hours straight time [pay] per calendar
     year" for full-time Nurses and up to "twelve (12) hours straight time [pay] per calendar year" for
24   part-time Nurses."   (Puleo Opp. Decl., Exh. B at 40.)   Moreover, as discussed, the CBAs
     expressly set forth the straight time hourly rate of pay for nurses. (*Id.*, Exh. B at 68-70.)  Thus,
25   Vasserman's argument that Article 18 does not provide for employee wages is unpersuasive.

26

27        [78]MTR Opp. at 10-11.

28        [79]*Id.*

                                          33

1    request to perform substantive work which does not require the Nurse to come into

2    the Hospital shall receive pay at the Nurse's Base Hourly Rate for all time actually

3    worked. *De minimus* time spent, defined as less than fifteen minutes in the

4    aggregate, in response to a call shall not be considered time actually worked."[80]

5    Newhall Memorial contends that the court must interpret the CBAs to determine whether

6    on-call time is *de minimis* or not.[81] This appears to respond Vasserman's assertion that Article

7    14, Section I "does not provide hourly rates that are thirty percent (30%) above California's

8    minimum wage rates" because it does not provide wages for "*de minimis*" work.[82] She also

9    contends that Section I does not provide "premium wage rates for all overtime hours worked"

10   because it provides that any substantive work performed while on on-call status will be paid at the

11   "Nurse's Base Hourly Rate."[83]

12   The court is not convinced that whether time is "*de minimis*" will require interpretation of

13   the CBAs, as the agreements specifically define "*de minimis*" as less than fifteen minutes in the

14   aggregate. As with Section 18's provision governing paid education leave, the real question is

15   whether *de minimis* time constitutes "hours worked" under California law. Resolution of this

16

17   [80]Puleo Opp. Decl., Exh. B at 28-29.

18   [81]MTR Opp. at 11-13.

19   [82]Motion to Remand at 11-12.

20   [83]*Id.* The court is also unpersuaded by Vasserman's arguments that Article 14, Section I
21   shows that § 514 does not apply. (See Motion to Remand at 11-12.) Vasserman's argument that
     Section I does not provide hourly rates that are thirty percent above California's minimum wage
22   rates because it does not provide wages for *de minimis* work ignores the explicit terms of the
     CBAs, which provide that all substantive time worked will be compensated at the Nurse's Base
23   Hourly Rate, which it is indisputably more than 30 percent above the state minimum wage. (See
     Puleo Opp. Decl., Exh. B at 28-29, 68-70.) This will not change even if *de minimis* time is
24   compensable as Vasserman appears to assert. Vasserman's argument that the CBAs do not
     provide premium wage rates for all overtime hours worked is similarly unavailing because the
25   three overtime plans provide premium pay if the "hours actually worked" in a single day exceed
26   8, 10, or 12 hours, or if the hours worked in a single week exceed 36 or 40 hours. (See *id.*, Exh.
     B at 26-28.) To the extent that time actually worked on-call exceeds these thresholds, the CBAs
27   make it clear that the employee will receive premium pay.

28

34

1   question necessarily requires interpretation and application of state law, not privately negotiated

2   agreements.  Stated differently, the court will have to determine whether "*de minimis*" on-call

3   time is compensable, which will necessarily require a consideration of *state law* principles.  Thus,

4   whether § 514 applies will not be substantially dependent on interpretation of the CBAs as opposed

5   to interpretation of state law.[84]

6        For the reasons stated, the court concludes that Vasserman's second claim for relief is not

7   preempted by § 301.

8                    **(2)    Whether Vasserman's Meal Period Claim is Preempted**

9        Newhall Memorial contends that Vasserman's meal period claim is preempted under § 301

10   because each of the CBAs provide for meal periods and also "sets forth detailed procedures

11   describing what employees must do if they claim they did not receive meal periods."[85]

12        Meal periods are a non-negotiable right under state law.  Courts have thus held that

13   California state law claims alleging meal period violations are not preempted even where the CBA

14   includes language entitling employees to such breaks.  *Valles v. Ivy Hill Corp.*, 410 F.3d 1071,

15   1082 (9th Cir. 2005) ("We need not, indeed may not, construe the Ivy Hill [CBA] in order to

16   consider whether a waiver exists because any provision of the [CBA] purporting to waive the right

17   to meal periods would be of no force or effect: The right in question is plainly nonnegotiable").

18   See *Roth v. CHA Hollywood Medical Center, L.P.*, No. 2:12–cv–07559 ODW (SHx), 2013 WL

19   5775126, *3 (C.D. Cal. Oct. 25, 2013) ("HPMC also argues that Section 301 preempts Ekin's

20   meal-break claims.  Ekin claims that (1) HPMC did not provide off-duty meal breaks to her and

21

22   [84]*Vranish v. Exxon Mobil Corp.*, 223 Cal.App.4th 103 (2014), a case on which Newhall
   Memorial relies, likewise does not compel the conclusion that interpretation of the CBAs will be

23   required.  In *Vranish*, plaintiffs argued that they had not been paid a premium wage and § 514 did

24   not apply because, although the CBA under which they were covered, provided for the payment
   of a premium wage, it did not define that term as it was defined in Labor Code § 510.  *Id.* at 110.

25   The *Vranish* court, of course, was not analyzing federal preemption, and indeed, distinguished
   *Gregory*, 317 F.3d 1050, on that very basis.  *Vranish*, 223 Cal.App.4th at 110 n. 3.

26   Consequently, the court finds *Vranish* inapposite.

27   [85]MTR Opp. at 14-16.  Newhall Memorial does not challenge in its opposition Vasserman's

28   assertion that her meal period claim arises under rights created by state law.

putative class members in violation of the Labor Code due to understaffing and frequent interruptions; and (2) HPMC only provided Ekin and putative class members one meal break per 12–hour shift, whereas the Labor Code requires two meal breaks during a 12–hour shift. California law mandates that an employer provide off-duty meal periods, and that right is independent of any provision of the CBA. Again, Ekin's meal-break claims can be resolved simply by looking to payroll and time records and employee testimony. Like Ekin's rest-break claims, Section 301 does not preempt her mealbreak claims"); *Meyer v. Irwin Indus., Inc.*, 723 F.Supp.2d 1237, 1244 (C.D. Cal. 2010) ("Here, [plaintiff's] claims are based on rights conferred by California Labor Code §§ 512(a) and 226.7, and Wage Order No. 16. Thus, Plaintiff's second meal period claims arise under state law and do not substantially depend upon an interpretation of the CBA. Additionally, that the CBA includes terms that entitle employees to second meal periods is of no import. . . . As such, it is irrelevant that the CBA provides for similar claims under its own terms because the state law claims can be resolved without interpreting the CBA. Accordingly, § 301 does not preempt Plaintiff's second meal time claims" (citation omitted)). See also *Mitchell v. Mirant Cal., LLC*, No. C 07-05847 PJH, 2008 WL 501392, *3 (N.D. Cal. Feb. 21, 2008) ("Here, the court finds that while resolution of plaintiffs' claims – the determination whether Mirant has denied plaintiffs and the proposed class members meal and rest breaks in violation of California law – may require the court to look at the provisions of the CBA, it will not require any substantial interpretation of the CBA. Accordingly, the court finds there is no complete preemption, and that the motion to remand must be GRANTED, based on lack of subject matter jurisdiction").

Newhall Memorial argues that "[t]o evaluate [p]laintiff's claims that she did not receive meal periods, it will be necessary to analyze whether she (and others) complied with their obligations under the CBA concerning notification of their supervisors," because whether or not they complied with these obligations "will bear on (a) the credibility of his or her claims, (b) whether he or she comes with clean hands, and (c) whether Defendant was given an

opportunity to correct prior unreported untaken meal periods."[86]   Newhall Memorial's argument appears to assume that Vasserman's meal period claims are based on rights granted by the CBA, rather than those provided by state law.   "[I]t is irrelevant[, however,] that a CBA provides similar claims under its own terms where the state law claims can be resolved without any interpretation of the CBA."  *Meyer*, 723 F.Supp.2d at 1245 (citing *Lingle*, 486 U.S. at 409-10).

As with her overtime claim, Vasserman clearly and explicitly invokes the protections provided by the California Labor Code, not similar rights to meal periods provided by the CBAs.[87] Indeed, Newhall Memorial does not assert that interpretation or reference to the CBA will be required to determine whether Vasserman can state a *prima facie* case for violation of § 226.7. Rather, it asserts that resort to the CBAs is required to assess Vasserman's credibility, unclean hands, and Newhall Memorial's opportunity to cure.   These are, if anything, defenses to the meal period claim.   As noted, defenses based on the terms of a CBA cannot create preemption or federal question subject matter jurisdiction.   See *Humble*, 305 F.3d at 1008 ("As explained in *Cramer*, the plaintiff's claim is the touchstone for the preemption analysis, and 'the need to interpret the CBA must inhere in the nature of the plaintiff's claim' to trigger preemption.   To balance properly the policy considerations discussed above, *defensive reliance on the terms of the CBA*, mere consultation of the CBA's terms, or speculative reliance on the CBA will not suffice to preempt a state law claim" (emphasis added)).

Newhall Memorial disputes this, arguing that the resolution of the meal period claim will necessarily involve CBA provisions requiring that employees notify their supervisors of any meal period violation they experienced.[88]   As support, it cites *Allis-Chalmers*, in which the Supreme Court held that a state law claim that does not explicitly allege breach of a collective bargaining

---

[86]*Id.* at 15.

[87]See generally Complaint, ¶¶ 70-73; see, e.g., *id.*, ¶ 72 ("Defendant failed to provide, impeded, and/or discouraged Plaintiff and others from taking timely meal breaks of not less than thirty (30) minutes as required by the Labor Code during the relevant class period and/or failed to obtain legal waivers waiving the first or second meal period").

[88]MTR Opp. at 15.

agreement is nonetheless preempted if it is "inextricably intertwined" with, or so "substantially dependent" on, the terms of a labor contract that its resolution will require judicial interpretation of the agreement. *Allis-Chalmers*, 471 U.S. at 208, 213 (holding that a tort claim for breach of the duty of good faith and fair dealing was preempted by section 301 because "good faith" and "fair dealing" had to be assessed with reference to the contractual obligations of the parties). Specifically, it cites the Court's conclusion that

> "[r]he parties' agreement as to the manner in which a benefit claim would be handled [would] necessarily [have been] relevant to any allegation that the claim was handled in a dilatory manner. . . .  These questions of contract interpretation, therefore, underlie any findings of tort liability, regardless of the fact that the state court may choose to define the tort as 'independent' of any contract question. Congress has mandated that federal law govern the meaning given contract terms. Since the state tort purports to give life to these terms in a different environment, it is pre-empted." *Id.* at 218.

*Allis-Chalmers* is distinguishable.  There, resolution of a state tort claim for breach of the duty of good faith and fair dealing *required* a determination as to whether defendant's claims handling breached the duty of "good faith" and "fair dealing," which, in turn, required that the court interpret the parties' agreement to determine how they had agreed claims would be handled. Here, by contrast, Vasserman pleads a claim for violation of a state law that unambiguously requires employers to provide their employees with uninterrupted, paid meal periods.  The statute is violated when an employer fails to the meal periods available.  There is no need to look to the CBAs to determine whether a violation has occurred, i.e., whether Vasserman or the putative class members were denied the ability to take meal periods guaranteed by statute.  Therefore, the court concludes that Vasserman's meal period claim is not preempted by § 301 of the LMRA.

### (3)    Whether Vasserman's Remaining Claims are Preempted

Although it contends that Vasserman's overtime and meal period claims are preempted, Newhall Memorial does not argue that her other claims are likewise preempted by § 301. Vasserman's first cause of action alleges violation of California's UCL, Business and Professions

Code § 17200 *et seq*; her third claim alleges violation of Labor Code § 200 *et seq.*, while the fourth pleads a violation of § 226.  The sixth cause of action seeks civil penalties under PAGA, and the seventh alleges violation of Labor Code §§ 510(a), 1194, and IWC Wage Order 5-2001. In its notice of removal, Newhall Memorial does not indicate which claims it asserts are preempted by § 301; rather, it states, in the most general terms, that "various terms of the different CBAs must be interpreted in this matter to address Plaintiff's claims."[89]  Newhall Memorial also states that it "will provide more information in support of this short and plain statement if challenged to do so."[90]  After Vasserman filed a motion to remand, Newhall Memorial adduced additional information in support of an argument that her overtime and meal period claims were preempted.  It did not assert that Vasserman's first, third, fourth, sixth, or seventh claims require interpretation of the CBAs and are thus preempted by § 301 of the LMRA. Consequently, Newhall Memorial has abandoned any claim it might have had that these claims fall within the court's original jurisdiction.  See, e.g., *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009) ("'A party abandons an issue when it has a full and fair opportunity to ventilate its views with respect to an issue and instead chooses a position that removes the issues from the case,'" citing *Davis v. City of Las Vegas*, 478 F.3d 1048, 1058 (9th Cir. 2007)); *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) (holding that a plaintiff "'abandoned . . . claims by not raising them in opposition to [defendant's] motion for summary judgment,'" quoting *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n. 4 (9th Cir. 2005) (alteration original)); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n. 2 (7th Cir. 1996) ("Bombard's complaint also alleged that FWN violated the Family and Medical Leave Act. . . .  Bombard abandoned his FMLA claim after failing to respond to the FMLA arguments in FWN's motion for summary judgment"); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is on the

---

[89]Removal, ¶ 13.

[90]*Id.*

39

1   Parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary

2   judgment are deemed abandoned").

3       Even had Newhall Memorial not abandoned any preemption argument it may have had

4   regarding these claims, the court would conclude that it had failed to demonstrate that resolution

5   of Vasserman's first, third, fourth, sixth, and seventh claims requires interpretation of the CBAs.

6   The claims all seek to vindicate rights provided by state law.  None, moreover, requires

7   interpretation of the CBAs.  While the calculation of waiting time penalties will require reference

8   to wage rates set forth in the CBA, this is insufficient to preempt the claim.  See *Livadas*, 512

9   U.S. at 124 (holding that a Labor Code § 203 claim was not preempted because "the primary text

10  for deciding whether Livadas was entitled to a penalty was not the Food Store Contract, but a

11  calendar"); see *Lara v. San Bernardino Steel Inc.*, CV 11-1357 PA (Ex), 2011 WL 4480167, *3

12  (C.D. Cal. Sept. 20, 2011) (finding that Labor Code §§ 203 and 2802 claims arose under state

13  law and were not preempted); *Meyer*, 723 F.Supp.2d at 1245-46 (finding that a § 203 claim arose

14  under California law, was not waivable, and thus was not preempted).  Similarly, while inaccurate

15  wage statement claims may require reference to the CBAs, the relevant provisions of those

16  agreements do not, as the court has noted, require interpretation.  Thus, the claim is not

17  preempted.  *Avalos v. Foster Poultry Farms*, 798 F.Supp.2d 1156, 1162 (E.D. Cal. July 27, 2011)

18  (holding that claims for violations of California Labor Code §§ 201-03, 204, 226, 226.7, 512,

19  510, and 1194, IWC Wage Order 4-2001, and California Business and Professions Code § 17200

20  *et seq* arose under California law and were not preempted).  As respects Vasserman's rounding

21  claim, it is unclear that it even requires resort to the CBAs.  If it does, however, it would not be

22  preempted because no interpretation of the agreements is required.  *Avalos*, 798 F.Supp.2d at

23  1162; *Bonilla v. Starwood Hotels & Resorts Worldwide, Inc.*, 407 F.Supp.2d 1107, 1112-13

24  (C.D. Cal. 2005) (holding that claims for violations of state wage and hours laws, including

25  California Labor Code §§ 203 and 226.7, and violation of IWC Wage Order 5-2001 arose under

26  state law and were not preempted).  Finally, Vasserman's UCL claim is wholly derivative of her

27  other state law claims; the "unfair business practices" in which Vasserman contends Newhall

28  Memorial has engaged are violations of the state Labor Code.  While the court may have to look

to the CBAs to determine whether, in the context of the parties' agreements, the practices are "unfair," no interpretation of the agreements will be required.  Indeed, given its derivative nature, the court need not conduct a separate preemption analysis with respect to that claim.  See, e.g., *Bonilla*, 407 F.Supp.2d at 1113-14 ("When a district court remands a case to state court based on a preemption analysis of the relevant wage claims, it is unnecessary to conduct an analysis of related state law claims, including claims pursuant to Section 17000 of the California Business & Professions Code," citing *Gregory*, 317 F.3d at 1051).  The same is true of Vasserman's PAGA penalties claim.  Consequently, none of these additional claims support a finding of preemption under § 301.

> **(4)    Whether the Presence of Grievance and Arbitration Procedures Requires Analysis of the CBAs**

Finally, Newhall Memorial contends that various grievance and arbitration procedures set forth in each of the CBAs "raise additional issues of CBA interpretation."[91]  It asserts that the CBAs have "mandatory grievance and arbitration procedures for the resolution of the claims that [p]laintiff is pursuing," which "require the interpretation of those provisions of the CBA."[92]  The fact that the agreements provide for such procedures does not require that the court interpret the terms of the CBAs.

"[A] court may look to the CBA to determine whether it contains a clear and unmistakable waiver of state law rights without triggering [§] 301 preemption."  *Meyer*, 723 F.Supp.2d at 1243 (citing *Burnside*, 491 F.3d at 1059-60).  "[I]n order for a grievance and arbitration provision to implicate preemption, the 'union-negotiated waiver of employees' statutory right to a judicial forum' must be 'clear and unmistakable.'"  *Munoz v. Atlantic Express of L.A., Inc.*, No. CV 12-6074 GHK (FMOx), 2012 WL 5349408, *4 (C.D. Cal. Oct. 30, 2012) (quoting *Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 80-81 (1998)).

---

[91]MTR Opp. at 16-17.

[92]*Id.* at 16.

1    When a CBA's grievance and arbitration procedure does not directly reference the statutes

2    at issue, courts have concluded that the agreement does not contain a "clear and unmistakable

3    waiver" of an employee's right to a judicial forum.  See, e.g., *Wright*, 525 U.S. at 80-81

4    (concluding that a CBA that purported to 'cover all matters affecting wages, hours, and other

5    terms and conditions of employment' did not contain a clear and unmistakable waiver of the

6    covered employees' rights to a judicial forum to assert discrimination claims under the ADA);

7    *Martinez v. J. Fletcher Creamer & Son, Inc.*, No. CV 10-0968 PSG (FMOx), 2010 WL 3359372,

8    *3 (C.D. Cal. Aug. 13, 2010) (concluding that the plaintiff 'was not required to file a grievance

9    under the CBA to pursue his statutory claims,' given that 'the CBA [did] not directly reference

10   the [relevant federal and state wage and hour] statutes at issue, . . . [such that it] [did] not 'clearly

11   and unmistakably' waive Plaintiff's rights under those statutes"); see also *Munoz*, 2012 WL

12   5349408 at *5 ("Here, the CBA provides that '[t]he grievance procedure provided herein shall be

13   the sole and exclusive remedy for an alleged grievance under this Agreement and the result

14   achieved through the application of this procedure shall resolve a grievance for all purposes.'

15   Thus, because the CBA expressly limits the application of the grievance procedure to grievances

16   relating to the CBA, it does not, by its terms, subject Plaintiff's claims under state law to said

17   procedure.  Accordingly, we find that the CBA does not 'clearly and unmistakably' require

18   Plaintiff to file a grievance pursuant to the CBA to pursue her state law claims.  As such, the

19   grievance provision does not implicate LMRA preemption").

20   Newhall Memorial does not cite the relevant grievance and arbitration provisions of the

21   CBAs, nor does it articulate why the court would need to do more than "look to" the provisions

22   of the CBAs to determine whether the grievance and arbitration procedures apply, and whether

23   they constitute a clear and unmistakable waiver of Vasserman's rights under the Labor Code.  It

24   is apparent, however, from "looking to" the CBAs, that the relevant grievance and arbitration

25   provision is found in Article 12.[93]  Article 12 requires that all "grievance[s,] as defined [ ] herein,

26

27   _____

28   [93]See Puleo Opp. Decl. at 14, Article 12(D).

1  [ ] be considered in accordance with the [ ] grievance procedure" set forth in the CBA.[94]  The

2  CBA defines a "grievance" as "any complaint or dispute arising out of the interpretation or

3  application of a specific Article and Section of this Agreement during the term of this Agreement

4  or extensions thereof as to events or incidents arising only at the Hospital."[95]  Because the

5  provision mandates use of the grievance and arbitration procedure only where a grievance

6  "aris[es] out of the interpretation or application" of provisions of the CBAs, it does not, by its

7  terms, require that Vasserman's state law claims be grieved and arbitrated.  Thus, the grievance

8  and arbitration procedure does not constitute a "clear and unmistakable" waiver of Vasserman's

9  right to pursue those claims in a judicial forum, and does not provide a sufficient basis upon which

10 to conclude that her claims are preempted.  See *Munoz*, 2012 WL 5349408 at *5; *Martinez*, 2010

11 WL 3359372 at *3.

12      The court would find no preemption, in fact, even if Vasserman's claims fell within the

13 scope of the CBAs' grievance and arbitration procedure.  Numerous courts have held that a

14 defendant's argument that a plaintiff has waived her right to pursue state law claims due to a

15 grievance and arbitration provision in a CBA constitutes a "defense" that does not give rise to

16 preemption under the LMRA or create a federal question.  See, e.g., *Townsend v. Brinderson

17 Corp.*, No. CV 14-5320 FMO (RZx), 2014 WL 3694142, *4 (C.D. Cal. July 23, 2014)

18 ("Brinderson contends that these claims are nonetheless 'preempted by Section 301 because the

19 Court must analyze and interpret the CBA to determine, *inter alia*, whether its comprehensive

20 grievance and arbitration provisions extend to Defendants BP America, Inc., and BP Corporation

21 North America, Inc., despite the fact that the BP Defendants are not themselves parties to the

22 CBA.'  Brinderson's contention is unpersuasive. . . .  Brinderson (and presumably the BP

23 defendants) are merely relying upon the CBA to mount its defenses, which is insufficient for

24 preemption purposes," citing *Dahl v. Albertson's Inc.*, 234 Fed. Appx. 446, 449 (9th Cir. May

25 14, 2007) (Unpub. Disp.) ("Because [defendants] are looking to the Settlement Agreement's

26

27  [94]*Id.*

28  [95]*Id.*, Article 12(A).

43

1     arbitration and release provisions in 'mounting their defenses,' there is no preemption and removal

2     was improper under *Caterpillar* and *Cramer*")); *Munoz*, 2012 WL 5349408 at \*5 ("Moreover,

3     even if Plaintiff's claims may be subject to the grievance procedure, this argument constitutes a

4     defensive use of the CBA, which, under clearly established law, cannot create a federal question,"

5     citing *Meyer*, 723 F.Supp.2d at 1246-47); see also *Morales*, 2014 WL 2931174 at \*4 ("Here, the

6     issue is whether Amcor provided meal and rest periods in accordance with California wage-and-

7     hour law.  As a defense, Amcor may submit the CBA and argue that Morales and the rest of the

8     class agreed to forgo off-duty meal and rest breaks.  However, a valid defense will not support

9     removal to district court, it simply means that Amcor prevails in state court," citing *Placencia*,

10    2014 WL 2445957 at \*2).

                            **(5)      Conclusion Regarding § 301 Preemption**

11

12          For the reasons stated, the court concludes that Vasserman has alleged claims that arise

13    under state law, rather than the CBAs that governed her employment and that of putative class

14    members, and that resolution of her claims will not substantially depend on interpretation of those

15    agreements.  Accordingly, the court lacks federal question jurisdiction.

16          **3.      CAFA Jurisdiction**

17                 **a.      Legal Standard Governing CAFA Jurisdiction**

18          In 2005, Congress enacted the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119

19    Stat. 4.  CAFA gives district courts original jurisdiction to hear class actions "in which the matter

20    in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs," and "in

21    which [, *inter alia*,] any member of a class of plaintiffs is a citizen of a State different from any

22    defendant." 28 U.S.C. § 1332 (d)(2); see also *Luthis v. Countrywide Homes Loans Servicing LP*,

23    533 F.3d 1031, 1033-34 (9th Cir. 2008) ("The Class Action Fairness Act of 2005, § 4(a), 28

24    U.S.C. § 1332(d)(2), amended the requirements for diversity jurisdiction by granting district

25    courts original jurisdiction over class actions exceeding $5,000,000 in controversy where [the

26    citizenship of] at least one plaintiff is diverse from at least one defendant.  In other words,

27    complete diversity is not required.  CAFA also provided for such class actions to be removable

28    to federal court. See 28 U.S.C. § 1453(b).  CAFA was enacted, in part, to "restore the intent of

                                          44

1    the framers of the United States Constitution by providing for Federal court consideration of

2    interstate cases of national importance under diversity jurisdiction.' Pub. L. No. 109-2, § 2(b)(2),

3    119 Stat. 4, 5 (codified as a note to 28 U.S.C. § 1711)").

4          Under CAFA, the number of members of all proposed classes must exceed 100 in the

5    aggregate.  28 U.S.C. § 1332(d)(5)(B).  See also *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018,

6    1020-21 (9th Cir. 2007) ("As a threshold matter, CAFA applies to 'class action' lawsuits where

7    the aggregate number of members of all proposed plaintiff classes is 100 or more persons and

8    where the primary defendants are not 'States, State officials, or other governmental entities against

9    whom the district court may be foreclosed from ordering relief.'  § 1332(d)(5). . . .  Once the

10   prerequisites of § 1332(d)(5) are satisfied, CAFA vests federal courts with 'original' diversity

11   jurisdiction over class actions if (1) the aggregate amount in controversy exceeds $5,000,000, and

12   (2) any class member is a citizen of a state different from any defendant. § 1332(d)(2)"); *id.* at

13   1021 n. 3 ("The Fifth Circuit characterized § 1332(d)(5) as an 'exception' to CAFA jurisdiction

14   conferred under § 1332(d)(2). . . .  We view § 1332(d)(5) somewhat differently. . . . [S]atisfaction

15   of § 1332(d)(5) serves as a prerequisite, rather than as an exception, to jurisdiction under §

16   1332(d)(2).  This distinction is important because, as we discuss later, there are 'exceptions' to

17   the statute in which jurisdiction otherwise exists under § 1332(d)(2) but the federal courts either

18   *may* or *must* decline to exercise jurisdiction.  See, e.g., § 1332(d)(3)-(4)").

19         The Ninth Circuit has confirmed that CAFA does not disturb the traditional rule that the

20   burden of establishing removal jurisdiction is on the proponent of federal jurisdiction.  *Abrego-*

21   *Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 685 (9th Cir. 2006) ("We . . . hold that under

22   CAFA the burden of establishing removal jurisdiction remains, as before, on the proponent of

23   federal jurisdiction").

24              **b.     Whether the Court Has Jurisdiction Under CAFA**

25                   **(1)     Whether tokhe Numerosity Requirement is Satisfied**

26         As noted, under CAFA, the number of members of all putative classes must exceed 100

27   in aggregate.  28 U.S.C. § 1332(d)(5)(B).  In its notice of removal, Newhall Memorial proffers

28   Puleo's declaration to show that this requirement is satisfied.  Puleo, who, as noted, is Newhall

1    Memorial's Vice Present and Chief Human Resources Officer,[96] states that, based on a review of

2    personnel records, Newhall Memorial employed approximately 2,530 employees during the class

3    period in positions that are included in the putative class definitions in the complaint.[97]    Thus,

4    CAFA's numerosity requirement is satisfied.[98]

5                        **(2)    Whether the Minimal Diversity Requirement is Satisfied**

6            Vasserman asserts that Newhall Memorial has failed to adduce sufficient evidence showing

7    that CAFA's minimal diversity requirement is satisfied.[99]    Newhall Memorial counters that there

8    is minimal diversity because at least two putative class members are citizens of different states than

9    Newhall Memorial.[100]    To show that there is minimal diversity, Newhall Memorial must prove that

10   "any member of [the] class of plaintiffs is a citizen of a State different from any defendant."    28

11   U.S.C. § 1332(d)(2).    Newhall Memorial is a California citizen; in its notice of removal it alleges

12   that it is a California corporation with its principal place of business in California.[101]    Thus, it must

13   proffer evidence that at least one putative class member is a citizen of a state other than California.

14           In support of removal, Newhall Memorial proffered the declarations of Rolando Bergado

15   and Angela Watkins, two former non-exempt hourly employees who worked for it in California

16   during the class period.[102]    Bergado was employed by Newhall Memorial in California from

17   _____

18           [96]See Removal, Exh. 1 (Declaration of Mark Puleo in Support of Removal ("Puleo

19   Decl.")).

20           [97]*Id.*, ¶ 4.

21           [98]Vasserman does not dispute Newhall Memorial's showing with respect to the size of the

22   classes.

23           [99]Motion to Remand at 24.

24           [100]Remand Opposition at 18.

25           [101]Removal, ¶ 22 ("Defendant was, at the time of the filing of this action, and still is, a

26   corporation formed under the laws of the State of California, and has its principal and only place

     of business in California").

27           [102]See Declaration of Rolando Bergado in Support of Removal ("Bergado Decl."), Docket

28   No. 1-7 (Aug. 8, 2014); Declaration of Angela Watkins in Support of Removal ("Watkins

August 2008 to April 5, 2013; thereafter, he moved to Illinois where he has since remained and intends to reside indefinitely.[103]  Watkins, who was employed by Newhall Memorial in California from July 23, 2007 to January 2, 2014, moved to Maryland and then to Indiana after she left her job.[104]  She is in the process of obtaining a driver's license and registering to vote in Indiana and states that she intends to reside there indefinitely.[105]  Based on Bergado's and Watkins' declarations, it is apparent that they are citizens of Illinois and Indiana respectively.  See *Gilbert v. David*, 235 U.S. 561, 569 (1915) (holding that a person is a citizen of the state in which he or she is domiciled); *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) ("A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return").

Vasserman argues that Bergado and Watkins are not members of any putative class.[106]  She contends Newhall Memorial asserts that she "'seeks to represent all of [d]efendant's non-exempt employees in California' without regard to the class definitions in [p]laintiff's [c]omplaint" and thus "has failed to meet its burden [of showing] that minimal diversity exists."[107]

Vasserman seeks to represent five classes of non-exempt employees who worked at Newhall Memorial during the class period:

Class 1:       All hourly non-exempt employees of Newhall Memorial who worked
               more than eight (8) hours in a day or more than forty (40) hours in

---

Decl."), Docket No. 1-8 (Aug. 8, 2014).

[103]Bergado Decl., ¶¶ 2-4.

[104]Watkins Decl., ¶¶ 2-4.

[105]*Id.*, ¶ 4.

[106]Motion to Remand at 24 ("Defendant admits that it is a citizen of California and thus tries to attempt minimal diversity by claiming that a Mr. Rolando Bergado and a Ms. Angela Watkins are citizens of different states.  The issue here is that Defendant never offers any evidence that either Mr. Bergado or Ms. Watkins fall within the definition of the proposed class in Plaintiff's Complaint, as required by 28 U.S.C. § 1332(d)(1)(D)").

[107]*Id.*

47

1    a week from four (4) years before filing of this action through the

2    date of judgment and were not paid proper overtime and double time

3    wages ("Pay Plan Class");

4    Class 2:    All   hourly   non-exempt   employees   who   worked for Newhall

5              Memorial at some point from four (4) years before filing of this

6              action  through  the  date  of  judgment,  and  who  are  no  longer

7              employed with Newhall Memorial ("Waiting Time Penalty Class");

8    Class 3:    All  non-exempt  hourly  employees  who  worked for Newhall

9              Memorial from four (4) years before filing of this action through the

10             date of judgment who were subjected to Newhall Memorial's meal

11             period policies and practices ("Meal Break Class");

12   Class 4:    All  non-exempt  hourly  employees  who  worked for Newhall

13             Memorial from one (1) year before filing of this action through the

14             date of judgment who were provided a paystub, i.e., wage statement,

15             from Newhall Memorial ("Pay Stub Class");

16   Class 5:    All  non-exempt  hourly  employees  who  worked for Newhall

17             Memorial from four (4) years before filing of this action through the

18             date of judgment, who were subject to Newhall Memorial's rounding

19             policy and practice ("Rounding Class").[108]

20        As noted, both Bergado and Watkins were non-exempt hourly employees who worked for

21   Newhall Memorial during the class period.[109]  Based on Vasserman's definition of the putative

22   classes, Bergado and Watkins qualify as putative class members.  The classes she seeks to

23   represent are classes of "[a]ll hourly, non-exempt employees who worked for Newhall Memorial"

24   during the various limitations periods.  Vasserman cannot defeat federal jurisdiction by arguing,

25   contrary to the allegations in her complaint, that she seeks to represent only those who are

26

27        [108]Complaint, ¶ 18.

28        [109]See Bergado Decl., ¶ 2; Watkins Decl, ¶ 2.

1   "similarly situated" to her, and thus that she does not seek to represent "non exempt, hourly

2   employees" who no longer reside in California or are not California citizens.  Because Bergado

3   and Watkins are members of the classes defined in the complaint, CAFA's minimal diversity

4   requirement is satisfied because two putative class members have citizenship different than

5   Newhall Memorial's.

6                                 (3)      **Whether the Amount in Controversy Requirement is**

7                                          **Satisfied**

8                                 (a)      **Legal   Standard   Governing   the   Amount   in**

9                                          **Controversy Under CAFA**

10          Vasserman next contends that Newhall Memorial has failed to establish that the amount in

11   controversy exceeds $5,000,000.[110]  "[W]hen the plaintiff fails to plead a specific amount of

12   damages, the defendant seeking removal 'must prove by a preponderance of the evidence that the

13   amount in controversy requirement has been met.'"  *Lowdermilk*, 479 F.3d at 994, 998 (9th Cir.

14   2007) (quoting *Abrego Abrego*, 443 F.3d at 684).  See also *Guglielmino v. McKee Foods Corp.*,

15   506 F.3d 696, 699 (9th Cir. 2007) ("[W]here it is unclear or ambiguous from the face of a state-

16   court complaint whether the requisite amount in controversy is pled . . . we apply a preponderance

17   of the evidence standard"); *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th

18   Cir. 2003) (per curiam); *Singer v. State Farm Mutual Auto. Ins. Co.*, 116 F.3d 373, 376 (9th Cir.

19   1997).  Vasserman's complaint does not plead a specific amount of damages.  Thus, to invoke

20   jurisdiction under CAFA, Newhall Memorial must show by a preponderance of the evidence that

21   there is more than $5,000,000 at issue.

22

23

24

25

26

27   _____

28          [110]Motion to Remand at 20-24.

(b)     **Whether Newhall Memorial Has Established by a Preponderance of the Evidence that the Amount in Controversy Requirement is Met**

i)     **Newhall Memorial's Estimate of Potential Class Damages**

Newhall Memorial's estimate of the amount in controversy addresses five types of relief sought in Vasserman's complaint:

| No. | Claim | Newhall Memorial's Estimated Amount in Controversy[111] |
|-----|-------|--------------------------------------------------------|
| 1. | Unpaid Overtime | $8,267,903 |
| 2. | Waiting Time Penalties | $2,164,140 |
| 3. | Penalties under § 226 for Failure to Provide Accurate Wage Statements | $3,878,350 |
| 4. | Missed Meal Periods | $9,183,758 |
| 5. | Penalties under PAGA | $8,021,900 |
| | **TOTAL** | **$31,516,051** |

In estimating the value of the class claims, Newhall Memorial has calculated the potential recovery for unpaid overtime and meal period claims for the four-year class period alleged in the complaint; it has assumed, by contrast, that a one-year limitations period applies to claims under Labor Code § 226 and PAGA.[112]  In estimating waiting time penalties under Labor Code § 200 *et seq.*, Newhall Memorial calculated possible penalties for the 275 putative class members who left its employ since June 18, 2013.[113]  Although Vasserman does not dispute Newhall Memorial's

---

[111]MTR Opp. at 20-22.

[112]*Id.*

[113]*Id.* at 20; see also Puleo Decl., ¶ 7.

1   use of a four year limitations period for her overtime and meal period claims, it is incorrect as a

2   matter of law,[114] and has inflated Newhall Memorial's estimate of damages on the two claims by

3   at least 25 percent.[115]

4                            **a)**      **Unpaid Overtime Claim**

5         In estimating that the class might recover as much as $8,267,903 on its unpaid overtime

6   claim, Newhall Memorial first approximated the number of putative class members who could

7   assert a claim for unpaid "daily overtime."[116]  Puleo states that putative class members worked

8   under three separate overtime plans – an 8/40 plan, a 10/40 plan, and a 12/36 plan.[117]  Under the

9

10      [114]The California Supreme Court has held that "[a] three-year statute of limitations applies

11   to [claims for wages] (Code Civ. Proc., § 338, subd. (a)) ('An action upon a liability created by

      statute, other than a penalty or forfeiture'), while a one-year statute of limitations governs claims

12   for penalties (Code Civ. Proc., § 340, subd. (a)) ('An action upon a statute for a penalty or

      forfeiture')."  *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal.4th 1094, 1102, 1120 (2007)

13   (affirming use of a three-year statute of limitations for claims under California Labor Code

14   § 226.7 for missed meal/rest periods); see also *Gentry v. Superior Court*, 42 Cal.4th 443, 470–71

      (2007) (noting that generally California Code of Civil Procedure § 338's three-year statute of

15   limitations applies to claims for overtime wages).  If the correct three-year statute of limitations

16   is used to calculate possible damages on Vasserman's overtime and meal period claims, Newhall

      Memorial's estimate of potential damages on the claims is overstated by a minimum of 25 percent,

17   and perhaps by more, depending on the number of class members who were employed during the

18   past three years as opposed to the past four years.  Because the court concludes that Newhall

      Memorial's calculation of the amount in controversy is not sufficiently supported on other

19   grounds, the court need not determine whether its argument in support of removal indicates an

20   intention to waive the limitations defense.

21      [115]Vasserman alleges that the class period for her overtime, waiting time penalty and meal

      period claims commenced four years prior to the filing of the complaint.  (See Complaint, ¶ 18.)

22   She may have done so because her Business and Professions Code § 17200 claim is governed by

23   a four-year limitations period.  See CAL. BUS. & PROF. CODE § 17208 ("Any action to enforce

      any cause of action pursuant to this chapter shall be commenced within four years after the cause

24   of action accrued").  Although Newhall Memorial has used a four-year class period in estimating

25   damages on Vasserman's overtime and meal period claims, none of its calculations is based on

      the § 17200 claim.  It thus overstates damages on the overtime and meal period claims.

26      [116]MTR Opp. at 20.

27      [117]Declaration of Mark Puleo in Support of Newhall Memorial's Opposition to Plaintiff's

28   Motion to Remand ("Puleo Opp. Decl."), Docket No. 19-1 (Nov. 3, 2014), ¶ 7.

8/40 plan, employees were purportedly paid a premium rate of one and one half times their base hourly rate plus any differential pay for time worked in excess of eight hours a day or forty hours a week.[118]  Under the 10/40 plan, employees were paid a premium for hours worked in excess of ten hours a day or forty hours a week; employees paid under the 12/36 plan received premium pay for time worked in excess of twelve hours a day or thirty-six hours a week.[119]  Because Vasserman's overtime claim is premised on "daily overtime" – i.e., she contends that Newhall Memorial did not pay overtime for hours worked in excess of eight hours in a day – Puleo took into account only those putative class members who were covered by the 10/40 and 12/36 overtime plans because, under these plans, employees were not entitled to premium pay for hours worked in excess of eight hours in one work day.[120]  Based on his review of company records, Puleo reports that approximately 45% of the putative class worked under the 10/40 or 12/36 overtime plans.

Using the "45% of putative class member[s] [who] work[ed] shifts that are over 8 hours but are not paid 'daily overtime'" for hours in excess of eight hours, Newhall Memorial assumed that each class member worked eight hours of "daily overtime" per pay period" during the entire class period.  Because Puleo states that class members collectively worked 140,039 pay periods during the class period and Vasserman alleges that the class members were only paid straight time for hours in excess of eight per day,[121] Newhall Memorial multiplied 140,039 pay periods by 8 hours, and then multiplied the resulting number by $16.40, the difference between the average hourly rate for putative class members and the average overtime rate.[122]  Thereafter, it multiplied the resulting number by 45% to reach its estimated damage figure.  Newhall Memorial does not

---

[118]*Id.*

[119]*Id.*

[120]*Id.*

[121]Puleo Opp. Decl., ¶ 4.

[122]MTR Opp. at 20; see Puleo Opp. Decl., ¶ 4.

1    explain the basis for its assumption that each class member not paid daily overtime worked eight

2    hours of overtime during each pay period.[123]

3                                   **b)    Waiting Time Penalties**

4          California Labor Code § 203(a) states in relevant part: "If an employer willfully fails to

5    pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 202, and

6    205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall

7    continue as a penalty from the due date thereof at the same rate until paid or until an action

8    therefor is commenced; but the wages shall not continue for more than 30 days."

9          In estimating the potential class recovery on Vasserman's waiting time penalties claim

10   under § 203, Newhall Memorial "assum[ed] each terminated employee worked 8 hours per

11   day,"[124] and that each former employee would receive waiting time penalties for a full thirty days

12   at the average hourly rate of $32.79 per hour.[125]  Because Puleo reports that 275 non-exempt

13   employees were terminated or have resigned since June 18, 2013,[126] Newhall Memorial estimates

14

15

16         [123]MTR Opp. at 20.  Newhall Memorial maintains this is a "conservative estimate as those
17   who worked on a 12/36 plan worked 12 hours of 'daily overtime' per week."  They cite Puleo's
18   opposition declaration in support of this fact.  (*Id.*, n. 11.)  The cited portion of Puleo's
     declaration does not demonstrate that employees working under either the 10/40 or 12/36 plans
19   would have worked 8 or 12 hours of "daily overtime" per week respectively.  Puleo merely states
     when employees are entitled to receive premium pay under the plans in question; there is no
20   evidence that all employees covered by those plans worked full-time.  In fact, the CBAs
     specifically contemplate that some nurses will work part-time (see Puleo Opp. Decl., Exh. B at
21   19-20).  Vasserman's class, moreover, includes *all* hourly, non-exempt employees – both full-time
22   and part-time.  More fundamentally, even if all class members covered by the 10/40 or 12/36
     plans *did* work full time, the overtime totals would differ from the eight hours of overtime per pay
23   period assumed by Newhall Memorial.  Newhall Memorial provides no explanation and identifies
24   no factors that caused it to use a figure of eight hours of overtime per pay period.  Consequently,
     the number is speculative and unsupported.
25

26         [124]MTR Opp. at 20.

27         [125]*Id.*

28         [126]Puleo Opp. Decl., ¶ 7.

                                                  53

1   a potential class recovery on this claim of $2,164,140.[127]   Once again, Newhall Memorial does

2   not explain the basis for these assumptions.

3                                                   c)       **Penalties under Labor Code § 226**

4          California Labor Code § 226(a) provides that "[e]very employer shall, semimonthly or at

5   the time of each payment of wages, furnish each of his or her employees . . . an accurate itemized

6   statement in writing showing (1) gross wages earned; (2) total hours worked by the employee . . .

7   (5) net wages earned, . . . (8) the name and address of the legal entity that is the employer, . . .

8   and (9) all applicable hourly rates in effect during the pay period and the corresponding number

9   of hours worked at each hourly rate by the employee."   Section 226(e) provides that "[a]n

10  employee suffering injury as a result of a knowing and intentional failure by an employer to

11  comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars

12  ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per

13  employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of

14  four thousand dollars ($4,000)."

15         In calculating a potential class recovery of $3,878,350 on this claim, Newhall Memorial

16  assumed that each of the 1,583 putative class members it has employed since June 18, 2013,

17  would be entitled to recover for violations each pay period, i.e., every two weeks from June 18,

18  2013 until the date of removal, August 8, 2014.[128]   Newhall Memorial set forth this calculation

19  in its opposition to Vasserman's motion to remand:

20         "As there are approximately 1,583 putative class members who have been

21         employed from June 18, 2013 until August 8, 2014 (the date of removal) who have

22         worked over 80,000 work weeks, each employee has worked an average of

23         approximately 51 work weeks (80,000/1,583 = 51).   (Puleo Decl. ¶ 5.)

24         Employees are paid every two weeks.   (Puleo Decl., ¶ 6.)   Thus, during the one-

25         year statute of limitations, employees have received an average [of] more than 25

27  [127]MTR Opp. at 20.

28  [128]*Id.* at 21.

54

1   paychecks.  Thus, the amount in controversy would be $79,150 for the alleged

2   initial violations ($50 x 1,583 employees).  The amount in controversy for the 24

3   subsequent alleged violations would be $3,799,200 ($100 x 1,583 employees x

4   24)."[129]

5       As can be seen, Newhall Memorial assumed a 100 percent violation rate – i.e., that every

6   putative class member received an inaccurate wage statement every pay period during the

7   limitations period.  Newhall Memorial adduces no evidence supporting this assumption.

8                          **d)       Meal Period Claim**

9       In estimating that the missed meal period class could recover total damages of $9,183,758,

10  Newhall Memorial "assume[d] [ ] two missed meal periods per pay period."[130]  Assuming class

11  members can recover one hour of wages per violation, Newhall Memorial multiplied the 140,039

12  pay checks received by each of 2,530 putative class members by two violations; it then multiplied

13  the resulting number by $32.79, i.e., the average hourly rate of a putative class member during

14  the class period.[131]

15      As with Newhall Memorial's other calculations, its estimate of meal period damages under

16  Labor Code § 226.7 relies on an assumption that every class member missed two meal periods

17  each pay period during the class period.  Like Newhall Memorial's assumption that each class

18  member worked eight hours of daily overtime per week, the suggestion that each class member

19  missed two meal breaks per pay period is entirely speculative and unsupported.

20                          **e)       PAGA Penalties**

21      The Private Attorneys General Act ("PAGA") provides for the recovery of civil penalties

22  for violations of the California Labor Code.  See CAL. LAB. CODE § 2699(f).  The Act states, in

23  relevant part:

24

25  _____

26  [129]*Id.* at 21 n. 15.

27  [130]*Id.* at 21.

28  [131]*Id.*

"For all provisions of this code except those for which a civil penalty is specifically provided, there is established a civil penalty for a violation of these provisions as follows:

(1)     If, at the time of the alleged violation, the person does not employ one or more employees, the civil penalty is five hundred dollars ($500).

(2)     *If, at the time of the alleged violation, the person employs one or more employees, the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation.*

(3)     If the alleged violation is a failure to act by the Labor and Workplace Development Agency, or any of its departments, divisions, commissions, boards, agencies, or employees, there shall be no civil penalty." *Id.* (emphasis added).

In calculating class PAGA penalties, Newhall Memorial assumed that the 1,583 putative class members who were employed since June 18, 2013 would be able to recover PAGA penalties each pay period on each of Vasserman's Labor Code claims.[132]  For example, Newhall Memorial calculated potential damages of $8,021,900 for a single Labor Code violation by multiplying 1,583 employees by $100 for an initial violation.  It added the resulting number to the product of 39,318 (subsequent pay periods) x $200 (penalty for each subsequent violation).[133]   Based on this calculation, and on the fact that Vasserman asserts seven Labor Code violations on behalf of

---

[132]MTR Opp. at 21-22.

[133]*Id.*

the putative class, Newhall Memorial assumes that the amount in controversy on the PAGA claim is "over $56,000,000."[134]

In reaching its calculation of the amount in controversy related to Vasserman's PAGA claim, Newhall Memorial again assumes a 100 percent violation rate, calculating PAGA penalties for each of 40,901 pay periods without proffering any evidence to support such an assumption.[135]

---

[134]*Id.*

[135]The parties dispute whether PAGA penalties can be included in the amount in controversy in assessing whether the court has jurisdiction under CAFA. Vasserman argues that penalties cannot be included because the Ninth Circuit held in *Baumann v. Chase Inv. Servs. Corp.*, 747 F.3d 1117, 1124 (9th Cir. 2014) that "PAGA is not sufficiently similar to Rule 23 to establish the original jurisdiction of a federal court under CAFA." See also *id.* at 1122 ("we conclude that PAGA actions are also not sufficiently similar to Rule 23 class actions to trigger CAFA jurisdiction"). She asserts further that, even if it were, her "[f]ailure to request class status" for the PAGA claim "is fatal to CAFA jurisdiction." (Motion to Remand at 22-23 (citing *Hawaii ex rel. Louie v. HSBC Bank Nev., N.A.*, 761 F.3d 1027, 1040 (9th Cir. 2014).) Newhall Memorial counters that Vasserman "misread[s] her own complaint." It argues that she has pled the PAGA claim as a class claim because she asserts that "Plaintiff, and all hourly employees of Defendant, are 'aggrieved employees' as defined by Labor Code § 2699, in that they are all current and former employees of Defendant, and one or more of the alleged violations was committed against them.'" (MTR Opp. at 22 (citing Complaint, ¶ 7).)

Since the Ninth Circuit's decision in *Baumann*, no court has directly addressed whether PAGA penalties can be included in the amount in controversy when defendant seeks to remove a class action complaint that pleads a PAGA claim. Courts that have considered removals under CAFA, however, have implicitly addressed the question and reached conflicting conclusions. Compare *Hughes v. McDonald's Corp.*, No. C 14-17001 PJH, 2014 WL 3797488, *8-9 (N.D. Cal. July 31, 2014) (remanding action to state court after concluding that the amount in controversy, including damages on class claims for violations of the California Labor Code and PAGA penalties, did not exceed $5,000,000); *Ford v. CEC Entertainment, Inc.*, No. CV 14-01420 RS, 2014 WL 3377990, *6 (N.D. Cal. July 10, 2014) (concluding that CAFA's amount in controversy requirement was satisfied after including PAGA penalties in the calculation of total class damages) with *Sanchez v. Capital Contractors, Inc.*, No. C 14-2622 MMC, 2014 WL 4773961, *1-3 (N.D. Cal. Sept. 22, 2014) (discharging an order to show cause why a case should not be remanded for lack of subject matter jurisdiction under CAFA because defendant's initial calculation of the amount in controversy was based on PAGA penalties, and finding that the amount in controversy, not including PAGA penalties, exceeded $5,000,000). The court need not reach the issue, because it concludes that the assumption underlying Newhall Memorial's calculation of PAGA penalties, i.e., that there was a 100 percent violation rate with respect to each of Vasserman's Labor Code claims, is speculative and unsupported.

Newhall Memorial also assumes that 100 percent of recoverable PAGA penalties should be included in the amount in controversy.  Many courts have concluded that only 25% of potential PAGA penalties are properly included in calculating the amount in controversy, since 75% of civil penalties recovered under PAGA are awarded to the Labor and Workforce Development Agency ("LWDA").  "Aggrieved employees" recover only 25%.  See CAL. LAB. CODE § 2699(I) ("[C]ivil penalties recovered by aggrieved employees shall be distributed as follows: 75 percent to the Labor and Workforce Development Agency for enforcement of labor laws and education of employers and employees about their rights and responsibilities under this code, to be continuously appropriated to supplement and not supplant the funding to the agency for those purposes; and 25 percent to the aggrieved employees").  See also, e.g., *Smith v. Brinker Int'l, Inc.*, No. C 10-0213 VRW, 2010 WL 1838726, *2, 5 (N.D. Cal. May 5, 2010) (including only 25% of the total recovery possible under PAGA in calculating the amount in controversy on a PAGA claim); *Pulera v. F & B, Inc.*, No. 2:08-cv-00275 MCE DAD, 2008 WL 3863489, *4 (E.D. Cal. Aug. 19, 2008) ("The amounts recoverable by Plaintiff based on her PAGA claims are separate and distinct from the amounts recoverable by the State of California via the LWDA, and therefore these amounts may not be aggregated").

Although other courts have reached the opposite result,[136] The court finds the reasoning of the *Smith* and *Pulera* courts persuasive.  The disagreement concerns the "common and undivided interest" exception to the general rule that "aggregated claims of multiple claimants cannot form the basis of the amount in controversy."  *Pulera*, 2008 WL 3863489 at *3.  Courts concluding

---

[136]See *Urbino v. Orkin Services*, CV 11-06456 CJC (PJWx), Docket No. 33 (Oct. 5, 2011) ("This Court agrees with the *Thomas* court and finds that the amount in controversy in a PAGA claim is predicated on the total amount of civil penalties sought by the aggrieved employees"); *Thomas v. Aetna Health of California, Inc.*, No. 1:10–cv–01906–AWI–SKO, 2011 WL 2173715, *19 (E.D. Cal. June 2, 2011) ("[T]he amount at stake in a PAGA claim is predicated on the total amount of the penalties that can be sought by the aggrieved employees as the proxy of the LWDA"); *Schiller v. David's Bridal, Inc.*, No. 1:10-cv-00616 AWI SKO, 2010 WL 2793650, *8 (E.D. Cal. July 14, 2010) (holding that a plaintiff seeking PAGA penalties places 100% of the penalty amount in controversy").

1  that 100 percent of PAGA penalties can be included in the amount in controversy rely heavily on

2  their perception that PAGA was designed to vindicate a collective, rather than an individual right.

3     As the *Pulera* court noted, however, concluding that employees' individual rights should

4  be aggregated does not compel aggregation of their rights with those of a state agency, the

5  LWDA.  Citing *Troy Bank of Troy, Ind., v. G.A. Whitehead & Co.*, 222 U.S. 39, 40 (1911), the

6  *Pulera* court observed that the "common and undivided interest" exception relies on the notion

7  that "neither [party] can enforce [the claim] in the absence of the other."  *Pulera*, 2008 WL

8  3863489 at *3.  Under PAGA, "[h]owever, the LWDA can choose to enforce those claims itself,

9  regardless of the employee's involvement," just as employees can, if the LWDA approves, sue

10  without any direct involvement by the agency.  The statute thus permits either the LWDA or the

11  aggrieved employees to act independently to enforce the Labor Code.  *Id.*  This cuts against

12  aggregating the agency's claims with the employees' claims, even if the employees' individual

13  claims should be aggregated under the "common and undivided interest" exception.

14  Consequently, the court concludes that only 25% of the recovery possible on the cause of action

15  can be included in calculating the amount in controversy on the PAGA claim.  As a result,

16  Newhall Memorial's calculation of the amount in controversy on Vasserman's PAGA claim is

17  significantly overstated in addition to being based on speculative assumptions.

18        **ii)  Whether the Assumptions on Which Newhall**

19            **Memorial's Calculation is Based Are Supported by**

20            **"Summary Judgment Type Evidence"**

21     As noted, Newhall Memorial asserts the amount in controversy is $31,516,051 – well

22  above the jurisdictional threshold.  Vasserman contends, however, that Newhall Memorial relies

23  on "speculative and self-serving assumptions about key unknown variables," which are "clearly

24  'plucked from thin air,'" to calculate this amount.[137]  Noting that Newhall Memorial adduces

25  evidence only of the putative class size, the number of pay periods during the class period, and

26

27     [137]Motion to Remand at 21-24 (citing *Marshall v. G2 Secure Staff, LLC*, No. 2:14-CV-

28  04322-ODW (MANx), 2014 WL 3506608, *3 (C.D. Cal. July 14, 2014)).

1   average hourly wages, she asserts that Newhall Memorial has failed to meet its burden of

2   establishing by a preponderance of the evidence that the amount in controversy exceeds $5

3   million.  See *Abrego Abrego*, 443 F.3d at 683 ("Where the complaint does not specify the amount

4   of damages sought, the removing defendant must prove by a preponderance of the evidence that

5   the amount in controversy requirement has been met").

6          Specifically, Vasserman argues that key variables used in Newhall Memorial's calculations

7   are not based on summary judgment-type evidence.[138]  See *Singer*, 116 F.3d at 377 ("The district

8   court may consider . . . facts in the removal petition, and may 'require parties to submit summary-

9   judgment-type evidence relevant to the amount in controversy at the time of removal,'" quoting

10  *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1335-36 (5th Cir. 1995)).  Vasserman relies on the

11  Ninth Circuit's opinion in *Garibay v. Archstone Communities, LLC*, 539 Fed. Appx. 763, 764 (9th

12  Cir. Aug. 27, 2013) (Unpub. Disp.), as support for her argument.[139]  There, the court stated:

13          "The only evidence the defendants proffer to support their calculation of the amount

14          in controversy is a declaration by their supervisor of payroll, which sets forth only

15          the number of employees during the relevant period, the number of pay periods,

16          and general information about hourly employee wages.  Beyond this, the defendants

17          rely on speculative and self-serving assumptions about key unknown variables.  The

18          district court correctly concluded that Archstone's evidence was insufficient to

19          support removal jurisdiction under CAFA."

20          Newhall Memorial has proffered credible evidence regarding the size of the class, the

21  number of former employees who are potential class members, the number of class members

22  during the one year prior to the filing of the complaint, the percentage of class members who

23  worked under each overtime plan, the average hourly rate of pay, and the number of pay periods

24

25

26  _____

27      [138]*Id.*

28      [139]*Id.* at 21.

1   and work weeks in the class period.[140]  Certain of Newhall Memorial's assumptions, however,

2   have no evidentiary support.

3        First, Newhall Memorial assumed that the 45 percent of class members who worked under

4   the 10/40 and 12/36 overtime plans worked an average of eight hours of "daily overtime" per

5   week.[141]  Newhall Memorial does not explain the basis for this assumption.  Clearly, however,

6   it assumed that employees working under these plans routinely worked more than eight hours a

7   day.  Although Newhall Memorial relies on Puleo's declaration, Puleo provides no evidence of

8   the *hours worked* by putative class members.[142]  Evidence that certain putative class members were

9   governed by overtime plans that began paying premiums after the employee worked more than

10  ten or twelve hours in a day is not evidence of the hours actually worked by that employee, and

11  that, of course, is the evidence that is critical to Newhall Memorial's damages calculation.

12  Newhall Memorial does not proffer evidence all class members were full-time employees, such

13  that one could assume that any employee working under the 10/40 plan worked at least two hours

14  more than eight hours a day, or that any employee covered by the 12/36 plan worked at least four

15  hours more than eight per day.[143]  Nor can Newhall Memorial draw such an inference from the

16  terms of the CBAs or the class defined by Vasserman.  The CBAs covered both part-time and full-

17

18

19

20        [140]Puleo Opp. Decl., ¶¶ 4-7.  Vasserman objects to Newhall Memorial's evidence of the

21  number of putative class members, arguing that her class definition is limited to current and

    former Newhall Memorial hourly, non-exempt employees who are residents of California.  (See

22  Objections at 2-6.)  As the court has noted, however, this assertion is contradicted by the clear

    class definitions alleged in the complaint.  Consequently, the court concludes that Newhall

23  Memorial has proffered credible evidence concerning the number of putative class members.

24        [141]MTR Opp. at 20.

25

26        [142]See generally Puleo Opp. Decl.

27        [143]If all putative class members were working full-time, Newhall Memorial's estimate of

    total hours worked in excess of eight per day during each pay period would likely have been

28  higher than it is.

1   time, hourly, non-exempt nurses,[144] and do not distinguish between them in discussing the three

2   overtime plans.[145]  Vasserman's class, moreover, is not limited to full-time nurses, but includes

3   any "hourly, non-exempt employee" who worked more than eight hours in one day or forty hours

4   in one work week.[146]

5        Newhall Memorial simply provides no explanation as to why it selected a figure of eight

6   hours of overtime per pay period.  It does not adduce evidence concerning the average hours

7   worked by putative class members under the two plans in a given week, or any other evidence that

8   could support a finding that its assumption of eight hours of overtime per pay period is reasonable.

9   Rather, its assumption that 45 percent of the class worked an average of eight hours of overtime

10   per pay period is speculative and unsupported.  Thus, its calculation of the amount in controversy

11   on Vasserman's overtime claim is speculative and unreliable as well.  See *Smith*, 2010 WL

12   1838726 at *3 ("The complaint does not quantify the number of overtime hours that are allegedly

13   subject to compensation, nor the number of meal and rest periods that defendants allegedly failed

14   to provide.  Defendants provide no sufficient basis to apply the assumption of 2.5 overtime hours

15   each day towards calculating the amount in controversy.  The court may not base its jurisdiction

16

17

18        [144]Puleo Opp. Decl., Exh. B at 19 ("Fulltime: Nurses regularly scheduled for at least 72
     hours within each two-week pay period.  Provided that any Nurse who, prior to January 1, 2006,
19   was working at least 64 hours each two week pay period and was regularly scheduled for non-12
     hour shifts shall continue to be considered full-time as long as they continue to be scheduled in
20   the same manner"); *id.* at 19-20 ("Part-time: Non-fulltime Nurses regularly scheduled at least 48
     hours each two week pay period.  Provided that any Nurse who, prior to January 1, 2003, was
21   regularly scheduled between 16 and 47 hours each two-week pay period shall continue to be
22   considered part-time as long as they continue to be regularly scheduled to work under 48 hours
     each two-week pay period").
23

24        [145]*Id.*, Exh. B at 28 ("Each Nurse shall be assigned to the 8 & 40 Overtime Plan, or the
     10 & 40 Overtime Plan, or the 12 & 36 Overtime Plan.  The Hospital, in so assigning one of the
25   plans to any Nurse, shall first consult with that Nurse regarding the preference of that Nurse.
     (The Hospital, however, as a management right, pursuant to the Management Rights provisions
26   of this Agreement, shall not be controlled by such preference, and the Hospital, following any
27   such assignment, may thereafter change that assignment)").

28        [146]Complaint, ¶ 18.

62

1  on speculation and conjecture," citing *Lowdermilk*, 479 F.3d at 1002); *Martinez v. Morgan*
2  *Stanley & Co.*, No. 09CV2937 L (JMA), 2010 WL 3123175, *5 (S.D. Cal. Aug. 9, 2010)
3  ("Defendants use Plaintiff's allegation that she worked approximately 12 hours per weekday and
4  approximately 60 hours per week and assume that every associate worked four unpaid overtime
5  hours every work day.  Although Plaintiff alleged that her claims are typical of the class as a
6  whole and that class members consistently worked overtime, this does not provide a basis to
7  assume that every class member worked any particular number of overtime hours, much less that
8  he or she worked the same number of overtime hours every workday as Plaintiff did on an
9  unspecified occasion" (internal citations to the record omitted)).

10  Second, Newhall Memorial assumed that all class members were denied meal periods two
11  times per pay period.[147]  It proffers no evidence or indeed any argument as to why this assumption
12  is reasonable; it merely relies on Vasserman's allegation that "[d]efendant failed to provide,
13  impeded and/or discouraged [p]laintiff and others from taking timely meal breaks of not less than
14  thirty (30) minutes."[148]  This allegation provides no support for an assumption that class members
15  were denied two meal periods each pay period. See *Martinez*, 2010 WL 3123175 at *6 ("Plaintiff
16  alleged that she 'frequently missed meal and rest periods' and that '[i]t was the environment at
17  Morgan Stanley for Assistants to forego and work through his/her statutory rights to rest breaks.'
18  . . .  Based on the foregoing, Defendants assume that assistants were not provided three rest or
19  meal breaks per week.  This assumption is unsupported by the allegations in the complaint or the
20  evidence").

21  Third, Newhall Memorial's calculation of waiting time penalties presumes that each of the
22  275 class members who separated from Newhall Memorial during the class period did not receive
23  the wages he or she was due for a full thirty days.  Newhall Memorial does not explain why such
24  an assumption is warranted, and neither the allegations in the complaint nor evidence support
25  using such a variable.  Vasserman alleges that "each member of the class[ ] that no longer works

27  [147]MTR Opp. at 21.

28  [148]*Id.* (citing Complaint, ¶ 72.)

for Defendant, and who was not timely paid is entitled to one (1) day of pay in penalties for each day that he or she was paid late, until payment was made, up [to] a maximum of thirty (30) days."[149]  This allegation does not presume that each class member is entitled to recover penalties for a full thirty days.  Rather, it states that class members are entitled to penalties for "*up to*" thirty days.   See *Garibay v. Archstone Communities LLC*, 539 Fed. Appx. 763, 764 (9th Cir. Aug. 27, 2013) (Unpub. Disp.) ("Garibay also alleges violations of Cal. Labor Code § 203, which provides that employers who fail to timely pay all earned wages upon termination are subject to a fine equal to the employee's normal wages for each day the wages are late, up to a maximum of 30 days.  Archstone assumes that each employee would be entitled to the maximum statutory penalty, but provides no evidence supporting that assertion").  Additionally, as the court has noted previously, there is simply no support in the record for the assumption that all putative class members worked a minimum of eight hours per day.  Both the CBAs and Vasserman's class definition include part-time as well as full-time employees.  *Roth v. Comerica Bank*, 799 F.Supp.2d 1107, 1122-23 (C.D. Cal. 2010) ("the calculation assumes that amounts owed are not paid for a full thirty days after termination, and that all employees worked full-time rather than part-time.  Once again, defendants adduce no evidence supporting these assumptions"); *Martinez v. Morgan Stanley & Co. Inc.*,  2010 WL 3123175, *6 (S.D. Cal. Aug. 9, 2010) ("Defendants' calculation of estimated penalties assumes that no terminated associate was paid immediately and that each waited for at least 30 days.  This assumption is unsupported by the allegations in the complaint or Defendants' evidence").  Consequently, Newhall Memorial's calculation of the possible recovery on Vasserman's waiting time penalties claim is unsupported and speculative. See *Pereira v. Gate Gourmet, Inc.*, No. 08-07469 MMM (PJWx), 2009 WL 1212802, *5 (C.D. Cal. Apr. 30, 2009) ("Here, Gate Gourmet is the party best positioned to adduce evidence regarding its conduct.  In support of its notice of removal, Gate Gourmet could have proffered evidence regarding its actual policies or practices in order to counteract Pereira's allegations.  It could have conducted a sampling or other analysis demonstrating that it was more likely than not

---

[149]*Id.*, ¶ 60.

1  that a sufficient number of class members were not paid for thirty days after the date wages were

2  due [such] that more than $5,000,000 was at issue.  Adducing such evidence would not have

3  required that Gate Gourmet prove Pereira's case or answer the 'ultimate question' presented by

4  this litigation. . . . Consequently, the court must conclude that it has not carried its burden of

5  proof regarding subject matter jurisdiction.  As a result, remand is appropriate").

6        Similarly, Newhall Memorial assumes that every wage statement class members received

7  during the limitations period was inaccurate.  Vasserman's allegations, however, suggest only that

8  *some* wage statements during the class period were inaccurate; she pleads that "[d]uring the Class

9  Period, [d]efendant knowingly and intentionally failed to provide the [c]lass [m]embers, including

10  [p]laintiff, with timely and accurate wage and hour statements."[150]  The fact that an employee may

11  have received an inaccurate wage statement for one pay period – e.g., because of a missed meal

12  period – does not support an inference that the employee received an inaccurate wage statement

13  each and every pay period for a year.  Perhaps there were no additional missed meal periods.

14  Perhaps the employee was covered by the 8/40 plan and received premium pay for all overtime

15  worked.  There is simply no support in the record for assuming a 100 percent violation rate on

16  the inaccurate wage statement claim.

17        Absent evidence or allegations supporting the reasonableness of such an assumption,

18  Newhall Memorial's use of a 100 percent violation rate is speculative and unsupported.

19  Consequently, the court cannot credit its calculation of the potential recovery on Vasserman's §

20  226 claim.  See *De Leon v. NCR Corp.*, No. C 12–01637 SBA, 2013 WL 503092, *4 (N.D. Cal.

21  Feb. 8, 2013) ("The Court cannot credit Defendant's damages calculation because it is predicated

22  on an assumption that has no basis either in the complaint's plain language or in any

23  'summary-judgment-type' evidence.  The complaint does not allege that every customer engineer

24  that worked for Defendant during the relevant one-year period received inaccurate wage

25  statements every pay period.  Nor has Defendant submitted any concrete evidence demonstrating

26  . . . that each of the 192 putative class members that worked for Defendant during the relevant

27

28        [150]Complaint, ¶ 66.

65

1   period received 26 inaccurate wage statements.  The absence of concrete evidence leaves the Court

2   to speculate about the amount in controversy," citing *Lowdermilk*, 479 F.3d at 1002 (a court

3   cannot base jurisdiction on speculation and conjecture)); see also *Hernandez v. Towne Park, Ltd.*,

4   No. CV 12–02972 MMM, 2012 WL 2373372, *14 (C.D. Cal. June 22, 2012) ("The complaint

5   alleges that Towne Park 'intentionally and willfully failed to provide employees with complete and

6   accurate wage statements' by failing to account for hours worked off the clock at the end of shifts,

7   and during meal and rest breaks.  Based on this assertion, Towne Park infers that each employee

8   is entitled to claim a penalty for each pay period he or she worked. . . .  Once again, defendants

9   rely on speculation in order to meet their evidentiary burden"); *Jones v. ADT Security Servs.*, No.

10  CV 11–7750 PSG (JCGx), 2012 WL 12744, *5 (C.D. Cal. Jan. 3, 2012) ("Defendant's

11  assumption of a maximum violation rate is unfounded speculation.  There are no allegations in the

12  Complaint to support this assumption and Defendant provides no other evidence to support this

13  assumption. . . .  Simply assuming, with no factual basis, maximum violation rates will not meet

14  [defendant's] burden").

15      For similar reasons, Newhall Memorial's calculation of PAGA penalties is unsupported

16  because it is premised on the unsupported inference that each putative class member employed

17  since July 18, 2013, had his or her rights under the Labor Code violated *every pay period*.

18  Newhall Memorial simply does not proffer sufficient evidence from which the court can conclude

19  that such an assumption is warranted.

20      In sum, many of the assumptions that are key to Newhall Memorial's damages calculations

21  are not supported by summary judgment-type evidence.  See *Korn v. Polo Ralph Lauren Corp.*,

22  536 F.Supp.2d 1199, 1205 (E.D. Cal. 2008) ("[A] defendant must set forth the underlying facts

23  supports its assertion that the amount in controversy exceeds the statutory minimum"); *Kenneth*

24  *Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F.Supp.2d 993, 1001 (C.D. Cal. 2002) ("If

25  the amount in controversy is not clear on the face of the complaint, . . . defendant must do more

26  than point to a state law that might allow recovery above the jurisdictional minimum").

27  Accordingly, the court concludes that Newhall Memorial has not proffered sufficient evidence to

28  demonstrate that the amount placed in controversy by Vasserman's complaint exceeds $5,000,000.

1                       **iii)**        **Whether Newhall Memorial Can "Assume"**

2                                  **Violation Rates to Fill in Gaps in**

3                                  **Vasserman's Broad Allegations**

4       As the court has found that several of the assumptions on which Newhall Memorial's

5 damages estimate is based are not supported by summary-judgment-type evidence, the analysis

6 suggested by *Singer* for determining the amount in controversy on removal would appear to be

7 at an end.  116 F.3d at 377.  See *Harrington v. Mattel, Inc.*, No. C07-05110 MJJ, 2007 WL

8 4556920, *3 (N.D. Cal. Dec. 20, 2007) ("Because it is not clear from the face of the complaint

9 if the jurisdictional amount in controversy is met, Defendants have the burden to prove, by a

10 preponderance of the evidence, that the amount exceeds $5 million," citing *Matheson*, 319 F.3d

11 at 1090).

12       In evaluating whether it is "more likely than not" that wage-and-hour claims exceed the

13 jurisdictional threshold, however, California district courts have disagreed as to whether

14 defendants may assume certain variables – such as average hours of overtime worked per week

15 or the rate of wage statement violations – in calculating the amount in controversy.  Compare

16 *Coleman v. Estes Express Lines, Inc.*, 730 F.Supp.2d 1141, 1150 (C.D. Cal. 2010) ("Plaintiff

17 included no limitation on the number of violations, and, taking the complaint as true, Defendants

18 could properly calculate the amount in controversy based on a 100% violation rate") with *Smith*,

19 2010 WL 1838726 at *4 ("Defendants have failed to provide any evidence relating to either

20 plaintiff's actual earnings or number of hours worked, asking the court to assume that each

21 plaintiff worked an additional 2.5 hours each day in order to reach the amount in controversy

22 threshold").

23       When applying the preponderance of the evidence standard to California Labor Code

24 claims, many California district courts have refused to credit damage calculations based on

25 variables not clearly suggested by the complaint or supported by evidence, concluding that the

26 defendant's calculations are mere conjecture.  In *Martinez v. Morgan Stanley*, for example,

27 defendants sought to remove a wage-and-hour class action under CAFA and calculated the amount

28 in controversy based in part on an assumption that every class member worked four hours of

unpaid overtime every day.  2010 WL 3123175 at *5.  The court rejected this assumption and the calculation of potential class damages based on it, stating that "[a]lthough Plaintiff alleged that her claims are typical of the class as a whole and that class members consistently worked overtime, this does not provide a basis to assume that ever class member worked any particular number of overtime hours."  *Id.*  The court similarly rejected the calculation of meal/rest period violations, waiting time penalties, and wage statement penalties because the variables used were not clearly suggested by the complaint or supported by evidence.  *Id.* at *6.  See also *Smith*, 2010 WL 1838726 at *5 ("Because defendants' calculation of damages for alleged overtime and missed meal and rest periods is speculative and based on conjecture, the court limits the calculation of the amount in controversy to the reasonably certain amount of statutory penalties that could be claimed"); *Verner v. Swiss II, LLC*, No. CV 09-5701 PA (CTx), 2010 WL 99084, *3 (C.D. Cal. Jan. 6, 2010) ("In its Notice of Removal, Defendant alleges that because the First Amended Complaint alleges that Defendant 'consistently' violated California's wage and hour laws by failing to provide meal and rest periods, the amount in controversy is Plaintiff's hourly wage times 250 work days per year times three meal and rest break premiums per day times four years.  Nothing in the First Amended Complaint or the Notice of Removal supports a conclusion that the amount in controversy is three premiums for each day worked for the last four years.  Defendant has no 'summary-judgment type evidence' to support its calculation of the amount in controversy for the unpaid meal and rest breaks").

Other California district courts, however, have relied on calculations of wage and hour claims that utilized assumed variables where the complaint did not provide a basis for clear calculation.  See, e.g., *Gardner v. GC Servs. LP*, No. 10-CV-997-IEG (CAB), 2010 WL 2721271, *3 (S.D. Cal. July 6, 2010) (crediting defendant's overtime calculation based solely on evidence regarding the number of potential class members, and stating "[a]ccording to Defendant, if those employees, earning on average $14.50 per hour, worked 30 minutes of overtime per day over four years, the unpaid overtime owed on the overtime claim would exceed $3,000,000"); *Lippold v. Godiva Chocolatier, Inc.*, No. C 10-00421 SI, 2010 WL 1526441, *3 (N.D. Cal. Apr. 15, 2010) (crediting defendants' calculation of the amount in controversy based on an assumption

that plaintiff worked "13 hours a day every day" given an allegation that "he 'regularly and/or consistently worked in excess of 12 hours per day'"); *Coleman*, 730 F.Supp.2d at 1148-49 ("Plaintiff argues that Defendants cannot meet their burden of proof by assuming a 100% violation rate. However, courts have assumed a 100% violation rate in calculating the amount in controversy when the complaint does not allege a more precise calculation," citing *Korn*, 536 F.Supp.2d at 1205 ("Where a statutory maximum is specified, courts may consider the maximum statutory penalty available in determining whether the jurisdictional amount in controversy requirement is met"), and *Alvarez v. Limited Express, LLC*, No. 07CV1051 IEG (NLS), 2007 WL 2317125, *3 (S.D. Cal. Aug. 8, 2007) ("Here, paragraph 11 specifically describes the 'extreme workload' that made it 'virtually impossible' for defendant's employees to take meal periods and rest breaks. The same paragraph also describes the 'company culture' that discouraged meal periods and rest breaks. Having reviewed paragraph 11, the Court concludes plaintiff effectively alleges defendant did not allow any of its employees to take meal periods or rest breaks")); *Navarro v. Servisair, LLC*, No. C 08-02716 MHP, 2008 WL 3842984, *8 (N.D. Cal. Aug. 14, 2008) ("[Plaintiff] claims that he and others similarly situated regularly worked through their meal periods. . . . Thus, a full-time employee who has worked for a year with no daily meal period would be entitled to approximately two hundred fifty hours of back-pay, assuming that he works five days a week for fifty weeks per year"); *Muniz v. Pilot Travel Centers LLC*, No. CIV S 07-0325 FCD EFB, 2007 WL 1302504, *4 (E.D. Cal. May 1, 2007).

Several of these courts focused on the fact that plaintiff is the "master of the complaint," and commented that plaintiffs could choose to limit their damage claims. See *Muniz*, 2007 WL 1302504 at *4 ("[P]laintiff includes no fact-specific allegations that would result in a putative class or violation rate that is discernibly smaller than 100%, used by defendant in its calculations. Plaintiff is the 'master of [her] claim[s],' and if she wanted to avoid removal, she could have alleged facts specific to her claims which would narrow the scope of the putative class or the damages sought," citing *Caterpillar*, 482 U.S. at 392). See also *Coleman*, 2010 WL 3156850 at *7 ("Plaintiff only broadly alleges his wage-and-hour violations. . . . Plaintiff included no

69

1    limitation on the number of violations, and, taking his complaint as true, Defendants could

2    properly calculate the amount in controversy based on a 100% violation rate").

3        The court finds the latter group of cases unpersuasive, however, as they improperly shift

4    the burden to plaintiff to refute speculative assertions of jurisdiction and establish that there is no

5    jurisdiction.  See *Abrego Abrego*, 443 F.3d at 685 ("We . . . hold that under CAFA the burden

6    of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction").

7    Plaintiffs are not required affirmatively to deny speculative calculations of the amount in

8    controversy to avoid removal.  See *Smith*, 2010 WL 1838726 at *4 ("Defendants suggest that

9    plaintiffs have not submitted evidence to dispute defendants' estimates, but plaintiffs do not bear

10   the burden to demonstrate the amount in controversy").  Indeed, at this early stage of the

11   litigation, neither side may be able to calculate potential damages reliably.

12       Moreover, by crediting speculative estimates of the amount in controversy, courts that

13   allow defendants to rely on assumed violation rates ignore the "'strong presumption' against

14   removal jurisdiction."  *Gaus*, 980 F.2d at 566 (citing *Nishimoto v. Federman-Bachrach &*

15   *Associates*, 903 F.2d 709, 712 n. 3 (9th Cir. 1990) and *Emrich v. Touche Ross & Co.*, 846 F.2d

16   1190, 1195 (9th Cir. 1988)).  See also *id.* (the Ninth Circuit "strictly construe[s] the removal

17   statute against removal jurisdiction," citing *Boggs v. Lewis*, 863 F.2d 662, 663 (9th Cir. 1988);

18   *Takeda v. Northwestern National Life Ins. Co.*, 765 F.2d 815, 818 (9th Cir. 1985)).  "Federal

19   jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance,"

20   and "[t]he 'strong presumption' against removal jurisdiction means that the defendant always has

21   the burden of establishing that removal is proper."  *Id.* (citing *Libhart*, 592 F.2d at 1064).

22       It is, of course, true that a removing defendant is not responsible for "conduct[ing] a fact-

23   specific inquiry into whether the rights of each and every potential class member were violated,"

24   answering "the ultimate question the litigation presents," or "try[ing] the case [itself] for the

25   purposes of establishing jurisdiction."  *Bryan v. Wal-Mart Stores, Inc.*, No. C 08-5221 SI, 2009

26   WL 440485, *3 (N.D. Cal. Feb. 23, 2009).  Nonetheless, in evaluating whether a party has met

27   its burden of proof with respect to jurisdiction, several circuits have held that it is proper for

28   district courts to consider which party has access to or control over the records and information

required to determine whether the amount in controversy requirement is met.  See, e.g., *Amoche v. Guarantee Trust Life Insurance Co.*, 556 F.3d 41, 51 (1st Cir. 2009) ("[D]eciding whether a defendant has shown a reasonable probability that the amount in controversy exceeds $5 million may well require analysis of what *both* parties have shown. . . .  In the course of that evaluation, a federal court may consider which party has better access to the relevant information.  See *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1164 n. 3 (11th Cir. 2006) ('Defendants have better access to information about conduct by defendants, but plaintiffs have better access to information about which plaintiffs are injured and their relationship to various defendants')"); *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 447-48 (7th Cir. 2005) ("That the proponent of jurisdiction bears the risk of non-persuasion is well established. . . .  Whichever side chooses federal court must establish jurisdiction; it is not enough to file a pleading and leave it to the court or the adverse party to negate jurisdiction. . . .  And the rule makes practical sense.  If the burden rested with the proponent of remand, then Countrywide could have removed without making any effort to calculate its maximum exposure, and without conceding that it had faxed thousands of ads.  That would have thrown on Brill the burden of showing that Countrywide could not possibly have sent more than 3,333 junk faxes. . . .  Brill would have no way to show this early in the litigation, and plaintiffs in other kinds of suits would encounter similar difficulty.  When the defendant has vital knowledge that the plaintiff may lack, a burden that induces the removing party to come forward with the information – so that the choice between state and federal court may be made accurately – is much to be desired").

Here, Newhall Memorial is in the best position to adduce evidence regarding the working hours and wages of its non-exempt, hourly employees.  In support of its notice of removal, Newhall Memorial could have conducted a sampling or other analysis to show that it was more likely than not that many of its employees covered under the various overtime plans worked more than eight hours in a day or forty hours in a week.  A similar sampling or other type of analysis could also have been conducted respecting Vasserman's meal period and wage statement claims.  Adducing such evidence would not have required that Newhall Memorial prove Vasserman's claims or answer the "ultimate question" presented by the litigation.  Newhall Memorial,

1    however, failed to proffer evidence supporting its calculations regarding the amount in

2    controversy.   Consequently, the court concludes that it has not carried its burden of proof

3    regarding subject matter jurisdiction under CAFA.[151]

4

5    _____

     [151]Vasserman contends that the "home state controversy" exception to CAFA applies and

6    that the action should remanded to Los Angeles Superior Court on that basis.  (Motion to Remand

7    at 24-25.)  Newhall Memorial counters that Vasserman has not adduced sufficient evidence to
     invoke the home state controversy exception.  (MTR Opp. at 23-25.)  Although the court need not
     reach the question, it does so nonetheless.

8        The home state controversy exception applies if the party seeking remand establishes that

9    (i) two-thirds or more of all class members are citizens of California; and (ii) the "primary
     defendants" are citizens of California.  See 28 U.S.C. § 1332(d)(4)(B).  As the party seeking

10   remand, Vasserman bears the burden of establishing that the home state controversy exception
     applies.  See *Coleman v. Estes Exp. Lines, Inc.*, 631 F.3d 1010, 1013 (9th Cir. 2011) ("A

11   plaintiff whose putative class action has been removed can obtain a remand to state court under

12   any of three exceptions to the district court's subject matter jurisdiction under CAFA. . . .  A
     plaintiff seeking remand has the burden of showing that the [ ] exception applies" (citations

13   omitted)); *Serrano*, 478 F.3d at 1019 ("Defendant-Appellants 180 Connect, Inc., Ironwood
     Communications, Inc., and Mountain Center, Inc. ('the Employers') appeal from the district

14   court's order remanding a putative class action lawsuit to California state court under CAFA's

15   'home-state controversy' exception to federal jurisdiction.   The district court held that the
     Employers, the parties seeking removal, bear the burden to establish the exception.  We disagree.

16   The structure of the statute and the long-standing rule of proof of exceptions to removal dictate
     that the party seeking remand bears the burden of proof as to any exception under CAFA.

17   Consequently, we reverse, thus joining our sister circuits that have considered the issue.  See *Hart*

18   *v. FedEx Ground Package System, Inc.*, 457 F.3d 675 (7th Cir. 2006); *Frazier v. Pioneer*
     *Americas LLC*, 455 F.3d 542 (5th Cir. 2006); *Evans v. Walter Indus., Inc.*, 449 F.3d 1159 (11th

19   Cir. 2006)").

20       It is undisputed that Newhall Memorial, the only named defendant, is the "primary
     defendant" and that is a citizen only of California.  The parties disagree, however, as to whether

21   Vasserman has adequately shown that "two-third or more of the members of all proposed plaintiff

22   classes in aggregate" are California citizens.  Newhall Memorial asserts Vasserman has "provided
     no evidence at all on [the] issue."  (MTR Opp. at 23.)  Specifically, it argues that she has "failed

23   to show where any putative class members currently reside," and "has provided no evidence at

24   all regarding any putative class members' intention to continue to reside indefinitely in a particular
     state."  (*Id.* at 23-24.)

25       Vasserman counters that she need not adduce evidence concerning the citizenship of the
     putative class members because "[a]n inference [arises] that [d]efendant's non-exempt employees

26   who worked in Valencia, California, and are [the] subject of this class action are citizens of

27   California."  (Motion to Remand at 24-25.)  Vasserman relies on *Mondragon v. Capital One Auto*
     *Financing*, 736 F.3d 880, 881-82 (9th Cir. 2013), where the Ninth Circuit stated that "[a] pure

28   inference regarding the citizenship of prospective class members may be sufficient if the class is

### III.  CONCLUSION

For the reasons stated, the court grants Vasserman's motion to remand and denies Newhall Memorial's motion to dismiss at moot.

DATED: December 5, 2014

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

defined as limited to citizens of the state in question." (*Id.*)  While *Mondragon* permits drawing an inference of citizenship if a class is limited to citizens of a particular state, there is no basis for such an inference in this case.  As the court has noted, Vasserman does not define her classes by reference to the citizenship of putative class members; rather, she defines the classes, without limitation, as comprised of all "hourly, non-exempt employees who worked for [d]efendant" during the relevant limitations period.  (See Complaint, ¶ 18.)  When the class is not limited to citizens of a particular state, a plaintiff seeking remand must affirmatively demonstrate the citizenship of the putative class members; inferring that citizenship is impermissible "guesswork." *Mondragon*, 736 F.3d at 881-82 ("A pure inference regarding the citizenship of prospective class members may be sufficient if the class is defined as limited to citizens of the state in question, *but otherwise such a finding should not be based on guesswork*" (emphasis added)).  Because Vasserman has adduced no evidence concerning putative class members' citizenship, she has not sufficiently demonstrated that more than two-thirds of putative class members are California citizens such that the home state controversy exception applies.